**UNITED STATES of America, Appellee,**

v.

**Frank ADIPIETRO, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Vincent AURICCHIO, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Ruben O. SANCHEZ, Appellant.**

**Nos. 92–1776, 92–1791 and 92–2667.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1992.

Decided Jan. 22, 1993.

Rehearing Denied March 12, 1993.

Linda S. Sheffield, Atlanta, GA, argued, for Adipietro.

Steven Mahler, Kew Gardens, NY, argued, for Auricchio.

Cenobio Lozano, Harrisonville, MO, argued, for Sanchez.

Barry Levine, Mineola, NY, Charles E. Atwell, Susan M. Hunt, Kansas City, MO, and Perry S. Reich, Lindehurst, NY, on the brief.

Charles E. Ambrose, Kansas City, MO, argued, for appellee.

Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges and BATTEY * District Judge.

BATTEY, District Judge.

Frank Adipietro, Vincent Auricchio, and Ruben O. Sanchez and others were charged under a superseding indictment with conspiracy to distribute and to possess with intent to distribute a controlled substance (marijuana), a violation of 21 U.S.C. § 846.

Appellant Frank Adipietro (Adipietro) argues that his conviction should be remanded for resentencing because: (1) the district court [1] erred in calculating his base offense level by including marijuana which was the subject of future shipments; (2) the district court erred in failing to give him a reduction based on an uncompleted conspiracy; (3) a three-level enhancement which the district court applied for his role as a leader or manager of the conspiracy was not only substantively in error, but also in violation of his due process notice rights; and (4) the district court erred in not reducing his sentence based on his acceptance of responsibility. Adipietro was sentenced to imprisonment for 190 months (15 years, 10 months) followed by five years supervised release.

Appellant Vincent Auricchio (Auricchio) argues that his conviction should be reversed and remanded for retrial or for resentencing because: (1) the evidence at trial demonstrated multiple conspiracies in-

---

* The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri, Western Division.

stead of a single conspiracy as charged and the district court erred in refusing to give a multiple-conspiracy jury instruction; and (2) the district court erred in sentencing him based on 974 pounds of marijuana when only 496 pounds of marijuana had actually been delivered. Auricchio received a term of imprisonment of 88 months (7 years, 4 months) followed by 5 years of supervised release.

Appellant Ruben O. Sanchez (Sanchez) argues that his conviction should be reversed and remanded for retrial or for resentencing because: (1) the district court erred in not granting a mistrial after a prosecution witness referred to a subject which the court had already ruled would be inadmissible; (2) the district court erred in giving him a four-level enhancement for his role as a leader or organizer of the conspiracy; and (3) the district court erred in enhancing his sentence for obstruction of justice. Sanchez received a term of imprisonment of 340 months (28 years, 4 months) followed by 15 years of supervised release.

We affirm both the convictions and sentences of all appellants.

## FACTS

In 1988, Alan Kaniss (Kaniss) and Sanchez began transporting marijuana from Tucson, Arizona, to Mitchell Dozor (Dozor) in Philadelphia, Pennsylvania. In general, Kaniss assumed responsibility for transporting the marijuana and finding buyers while Sanchez assumed responsibility for finding suppliers of the marijuana, although Sanchez at times oversaw transportation of the marijuana when Kaniss was out of town.

In late 1990 or early 1991, Kaniss procured Adipietro's name as a potential buyer in the Long Island, New York, area. Adipietro and Kaniss met in Las Vegas in January, 1991, and Adipietro expressed to Kaniss that he wished to purchase marijuana from Kaniss. Adipietro stated that he could handle up to 24 deliveries a year of 100 to 200 pounds of marijuana each. Kan-

iss responded that he could provide Adipietro with perhaps 20 such deliveries over the next year.[2]

After the Las Vegas meeting, Adipietro contacted Auricchio, a fellow Long Island resident. Adipietro informed Auricchio that he was going to be involved in a number of purchases of bulk quantities of marijuana and that he would like Auricchio's assistance with these deliveries. Thereafter, Kaniss delivered three shipments of marijuana to Adipietro totalling 446 pounds (202.31 kilograms). At each of these deliveries Auricchio was present and helped unload the marijuana. One delivery was stored in Auricchio's family home and Auricchio helped Adipietro repackage the marijuana for further distribution, although Auricchio was not otherwise involved in the redistribution.

On April 16, 1991, Roy Jacoby (Jacoby) and Richard Bronger (Bronger), the two deliverymen who transported marijuana from Arizona to Philadelphia and Long Island for Kaniss, were stopped by a highway patrolman. A search revealed 187 pounds of marijuana.

Jacoby and Bronger agreed to cooperate with law enforcement officials. Under controlled conditions, they made their planned delivery to Dozor in Philadelphia. Dozor was then arrested and he also agreed to assist law enforcement officials. Jacoby and Dozor contacted Kaniss and told him that Dozor would not take 50 pounds of the shipment. Kaniss then instructed Jacoby and Bronger to deliver the 50 pounds to Adipietro in Long Island.

Jacoby and Bronger delivered the 50 pounds of marijuana to Adipietro in Long Island. Auricchio was not present at this delivery. Adipietro inquired how the delivery went in Philadelphia and accepted the 50 pounds. In addition, Adipietro gave Jacoby and Bronger over $103,000 in payment for a previous shipment. Thereafter, Adipietro, Auricchio, Kaniss, and Sanchez were arrested.

---

**2.** Twenty deliveries of an average of 150 pounds would be 3,000 pounds, or 1,360.8 kilograms. The United States Sentencing Guidelines estab-

lish 1 to .4536 as the ratio of pounds to kilograms. U.S.S.G. § 2D1.1, application note 10.

Dozor, Jacoby, Bronger, and Kaniss entered pleas of guilty. Adipietro, Auricchio, and Sanchez entered pleas of not guilty and were tried. All three were found guilty.

## DISCUSSION

### A. ISSUES RAISED BY ADIPIETRO

1. Calculation of Base Offense Level Using the Undelivered Shipments from Las Vegas Discussion

■ Over the course of the conspiracy, approximately 496 pounds (224.98 kilograms) were actually delivered to Adipietro.[3] The government argued at sentencing that Adipietro should be held accountable for the full amount of marijuana which Adipietro negotiated for in Las Vegas, which would amount to something over 1,000 but less than 3,000 kilograms. Adipietro argues that he should only be held accountable for the 496 pounds actually delivered to Long Island because his conversation with Kaniss in Las Vegas did not constitute a negotiation. Alternatively, Adipietro argues that even if that conversation constituted a negotiation, calculation of his base offense level by including those undelivered, negotiated amounts was nonetheless improper because the district court made no finding as to whether Kaniss had the intent and capability of producing the negotiated amount.

The court found that Adipietro was responsible for over 1,000 kilograms (Base Offense Level 32) based on the reasonable foreseeability to Adipietro that the object of the conspiracy would be the delivery of this amount of marijuana. S.Tr. 95. The court based its finding of reasonable foreseeability on Kaniss's testimony at the sentencing hearing concerning the Las Vegas meeting. S.Tr. 97–99. The court specifically found Kaniss's testimony concerning the substance of the meeting to be credible. S.Tr. 94–95.

■ A district court's findings as to quantity of drugs attributable to a criminal defendant will not be overturned on appeal unless clearly erroneous. *United States v.*

Alexander, 982 F.2d 262, 267 (8th Cir.1992) (citing *United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir.), cert. denied, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990)). A district court's findings as to the credibility of a witness are "virtually unreviewable on appeal." *United States v. Candie*, 974 F.2d 61, 64 (8th Cir.1992) (citing 18 U.S.C. § 3742(e) and *United States v. Pou*, 953 F.2d 363, 370 (8th Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 1982, 118 L.Ed.2d 580–81 (1992)).

Upon a review of the record, we find no error in the district court's findings.

2. Reduction for Uncompleted Conspiracy

■ Adipietro further argues that if his sentence was properly calculated pursuant to section 2D1.4, then pursuant to U.S.S.G. § 2X1.1(b)(2) he is entitled to a reduction for being a member of an uncompleted conspiracy. Section 2X1.1 states that if a conspiracy is "expressly covered by another offense guideline section, apply that guideline section." U.S.S.G. § 2X1.1(c)(1). Adipietro was convicted of a conspiracy involving a controlled substance. Such offenses are "expressly covered by another offense guideline section," namely section 2D1.4. Therefore, by its own terms, section 2X1.1 does not apply to determine Adipietro's sentence.

3. Enhancement Based on Managerial or Leader Role

The district court adjusted Adipietro's base offense level by three levels pursuant to U.S.S.G. 3B1.1(b). Adipietro argues that this was both substantively wrong and a violation of his right to notice under *Burns v. United States*, —— U.S. ——, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991).

a. Substance of the Adjustment

■ Adipietro attacks the substance of the adjustment by arguing that he was neither a manager nor a supervisor and that the conspiracy did not involve five or more persons.

---

**3.** This includes the final fifty-pound controlled delivery.

Section 3B1.1(b) requires a sentencing court to make two findings of fact before enhancement is proper: the court must find (1) that the defendant was a manager or supervisor and not an organizer or leader, and (2) the conspiracy consisted of at least five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(b). Whether a defendant is a manager or supervisor should be determined by considering, among other things, whether the defendant recruited accomplices and the degree of control and authority exercised by the defendant over others. U.S.S.G. § 3B1.1, application note 3.

The district court's finding that Adipietro was a manager or supervisor was based on evidence produced at the sentencing hearing and at the trial. It showed that Adipietro recruited Auricchio, that Adipietro directed and managed the activities of Auricchio, and that Adipietro at times directed the activities of Jacoby and Bronger. S.Tr. 132–33. The district court also specifically found that the conspiracy consisted of at least five members [4] and possibly seven,[5] and that the conspiracy was otherwise extensive. S.Tr. 132–33.

The district court's findings are not clearly erroneous.

b. Due Process Notice of the Adjustment

■ In addition to attacking the substantive correctness of his 3B1.1(b) adjustment, Adipietro also attacks the adjustment as being a violation of his right to notice under *Burns v. United States*, — U.S. —, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991). Adipietro's argument is based on the fact that the presentence report recommended a two-level adjustment for being a manager or supervisor under section 3B1.1(c) and at the sentencing hearing the district court *sua sponte* decided to apply the three-level adjustment of section 3B1.1(b). Adipietro's argument lacks merit.

*Burns* involved an upward *departure* from the designated sentencing range under the United States Sentencing Guidelines, rather than an adjustment or enhancement. *Burns*, — U.S. at —, 111 S.Ct. at 2183–84. Departures are sharply circumscribed under the sentencing guidelines and represent a more drastic change in a defendant's sentence than merely adjusting a sentence without going outside the presumptive sentencing range. *Compare* 18 U.S.C. § 3553(b) (stating that a departure can be made *only* when there exist aggravating or mitigating circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission") *with* 18 U.S.C. § 3742(e) (providing that a district court's factual findings in support of an adjustment will not be reversed on appeal unless clearly erroneous). While *Burns* mandates that both parties be given adequate notice before a court *departs* from the applicable guideline range, *Burns*, — U.S. at —, 111 S.Ct. at 2187, *Burns* does not mandate that adequate notice must be given before a district court addresses an *adjustment* or *enhancement.* *United States v. Canada*, 960 F.2d 263, 265–68 (1st Cir.1992) (holding that *Burns* does not require notice that the court will adjust the defendant's sentence where the defendant was already aware of the facts relevant to the adjustment); and *United States v. McLean*, 951 F.2d 1300, 1302–03 (D.C.Cir.1991) (holding that *Burns* does not require a court to give advance notice that it intends not to award a downward reduction recommended in the presentence report). *Cf. United States v. Thomas*, 969 F.2d 352, 356 n. 2 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 274, 121 L.Ed.2d 202 (1992) (stating that, while *Burns* does not require notice of enhancements, Fed.R.Crim.P. 32 requires that a defendant receive *some* notice of enhancements); *United States v. Palmer*, 946 F.2d 97, 100 (9th Cir.1991) (holding, without cit-

---

**4.** The five members were Kaniss, Jacoby, Bronger, Adipietro, and Auricchio.

**5.** The district court stated that Mitchell Dozor, the Philadelphia distributor, and Ruben Sanchez, the supplier of the entire conspiracy, were part of the conspiracy. Because Adipietro never had direct contact with these two conspirators and may not have known their names, the district court did not rely upon them in its tally for purposes of enhancing Adipietro's sentence under section 3B1.1(b). *See* S.Tr. 132–33.

**1474**

ing *Burns,* that it was not error for the district court not to have given defendant notice that it intended to deny a downward adjustment); and *United States v. Adams,* 938 F.2d 96, 99 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 974, 117 L.Ed.2d 138 (1992) (holding that *Burns* does not require the government to give defendant notice of enhancement under U.S.S.G. § 4B1.1 where the presentence report identified that section as applicable and calculated a guideline sentencing range using that section).  The district court adjusted Adipietro's sentence on a ground identified for adjustment in the presentence report.  The fact that the presentence report provides a section pertaining to "adjustment for role in the offense" constitutes sufficient due process notice.

This Court has held that the terms "manager" and "supervisor" as used in both section 3B1.1(b) and in subsection (c) have the same meaning.  *United States v. Pierce,* 907 F.2d 56, 57 n. 3 (8th Cir.1990). The presentence report in this case recommended a two-level enhancement under subsection (c) of section 3B1.1 for Adipietro's role as a manager or supervisor.  The district court ultimately enhanced Adipietro's sentence pursuant to subsection (b) of section 3B1.1 based on Adipietro's role as a manager or supervisor.  Therefore, because Adipietro received the presentence report at least 10 days prior to the sentencing date, Adipietro had adequate notice of an enhancement based on his role as a manager or supervisor in the conspiracy. The only thing Adipietro did not have notice of was the possibility that his sentence might be enhanced by three levels instead of two.  Adipietro's reliance on *Burns* is misplaced.

**4.  Acceptance of Responsibility**

■ Adipietro's final argument is that the district court erred in not giving Adipietro a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The district court decided that Adipietro was not entitled to a reduction for acceptance of responsibility based on a number of factors: (1) the timeliness of Adipietro's admission of his involvement, (2) the fact that Adipietro admitted to the probation officer only the facts brought out at trial, and (3) the fact that Adipietro never volunteered any information relating to his involvement in the conspiracy.  S.Tr. 157–62.

■ A decision by a district court as to whether a defendant has accepted responsibility is largely a factual question which turns on issues of credibility. *United States v. Earles,* 955 F.2d 1175, 1180 (8th Cir.1992); and *United States v. Evidente,* 894 F.2d 1000, 1002 (8th Cir.), *cert. denied,* 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990).  A district court's decision on this issue will be reversed on appeal only if clearly erroneous.  *United States v. Miller,* 951 F.2d 164, 165 (8th Cir.1991) (citing *United States v. Laird,* 948 F.2d 444, 446 (8th Cir.1991)).  Due deference is given to the findings of the district court in denying acceptance of responsibility.

We therefore affirm the district court's refusal to give Adipietro a reduction for acceptance of responsibility.

**B.  ISSUES RAISED BY AURICCHIO**

**1.  Multiple Conspiracy**

■ Auricchio argues that his conviction should be reversed and his case remanded for retrial because the evidence produced by the government at trial proved multiple conspiracies rather than a single conspiracy as charged in the indictment.[6]  Auricchio

---

**6.** The indictment charged Auricchio and the others as follows:

From on or about the 1st day of October, 1988, and thereafter up to and including the nineteenth day of April, 1991, in the Western District of Missouri, and elsewhere, defendants RUBEN O. SANCHEZ, FRANK ADIPIETRO, VINCENT AURICCHIO, ... did knowingly conspire, combine, confederate and agree together and with each other and with

Richard E. Bronger, Mitchell A. Dozor, Roy S. Jacoby, and Alan E. Kaniss, co-conspirators not indicted herein, and with others both known and unknown to the Grand Jury, to distribute and possess with intent to distribute more than one-thousand kilograms of marijuana, a Schedule I controlled substance, in violation of Sections 841(a)(1) and 841(b)(1)(A)(vii), Title 21, United States Code.

argues that the jury instruction given by the district court did not adequately protect him from spillover prejudice.[7] In essence, Auricchio argues that there was a fatal variance between the evidence and the indictment and that the district court should have given a multiple-conspiracy jury instruction.[8]

■ A single drug conspiracy involves two or more persons agreeing to commit a criminal act plus an act in furtherance of the conspiracy. *United States v. Watts*, 950 F.2d 508, 512 (8th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1276, 117 L.Ed.2d 502 (1992). A single conspiracy can exist notwithstanding the fact that the participants or their roles change, *Id.* (citing *United States v. Davis*, 882 F.2d 1334, 1340 (8th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 610 (1990)), or that multiple groups performing separate crimes or acts exist. *United States v. Roark*, 924 F.2d 1426, 1429 (8th Cir.1991) (citing *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981)). Furthermore, a defendant need not be aware of all other conspirators or all details of the conspiracy in order for a single conspiracy to exist of which the defendant is a part. *Watts*, 950 F.2d at 512 (citing *United States v. Alexander*, 943 F.2d 825, 829–30 (8th Cir.1991); and *United States v. Zimmerman*, 832 F.2d 454, 458 (8th Cir.1987)).

■ The issue of whether a single conspiracy or multiple conspiracies existed is a question for the jury. *Watts*, 950 F.2d at 512 (citing *Alexander*, 943 F.2d at 829–30; and *Zimmerman*, 832 F.2d at 457). In *Watts*, the jury instructions ensured that the jury could only convict defendants if the jury found that the conspiracy charged in the indictment was the conspiracy engaged in by a defendant. *Watts*, 950 F.2d at 512. Thus, the *Watts* court held that under the instructions given and viewing the evidence in the light most favorable to the government,[9] there was substantial evidence to support the jury finding of one conspiracy involving all the convicted defendants. *Id.*

Similarly, in this case, the instructions given to the jury by the district court would only permit the jury to arrive at a finding of guilt for each defendant if the jury found that the conspiracy charged in the indictment was the conspiracy engaged in by that defendant.[10] The evidence supports the finding that the object of the conspiracy was to transport and deliver marijuana from its point of origin to the East Coast, namely Philadelphia and New York. The evidence in this case established that the marijuana shipments all originated with Sanchez and Kaniss, that Adipietro and Auricchio knew about the Philadelphia deliveries, and that deliveries to Philadelphia and Long Island were linked, as when, on the final controlled delivery, Long Island received what was left over or unwanted from the Philadel-

The indictment then went on to detail the manner and means of the conspiracy as well as the overt acts taken in furtherance thereof.

7. The lengthy instruction at issue first set out three elements which the government had to prove. These elements described the single conspiracy beginning on or about October 1, 1988, and lasting until April 19, 1991, and involving all the charged conspirators. The instruction and then defined several of the terms used in describing those elements. Then the instruction stated:

If the United States has failed to prove beyond a reasonable doubt the existence **of the conspiracy which is charged,** then you must find Vincent Auricchio not guilty **even though some other conspiracy did exist.** Likewise, if the United States has failed to prove beyond a reasonable doubt that Vincent Auricchio

was a member **of the conspiracy which is charged,** then you must find Vincent Auricchio not guilty **even though he may have been a member of some other conspiracy.** Jury Instruction of the district court (emphasis added).

8. Auricchio did request the district court to give such an instruction during the trial of this matter. T.Tr. 2491.

9. *See United States v. Roark*, 924 F.2d 1426, 1429 n. 4 (8th Cir.1991) (citing *United States v. Jackson*, 696 F.2d 578, 582 n. 1 (8th Cir.1982), *cert. denied*, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983)).

10. *See supra* note 7 for the pertinent text of the jury instruction given by the district court.

phia delivery. In light of the jury instruction given and viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found that the evidence established beyond a reasonable doubt the existence of a single conspiracy between all the co-conspirators. *See United States v. Regan*, 940 F.2d 1134, 1135 (8th Cir.1991) (upholding the jury finding that defendant was a conspirator in a single conspiracy even though the defendant did not participate in each of the many transactions undertaken as part of the single conspiracy). Auricchio is not entitled to a new trial on his multiple conspiracy claim.

### 2. Reasonable Foreseeability of Future Shipments of Marijuana

■ Over the course of the conspiracy, approximately 496 pounds (224.98 kilograms) were actually delivered to Adipietro and Auricchio.[11] The government argued at sentencing that Adipietro *and* Auricchio should be held accountable for the full amount of marijuana which Adipietro negotiated for in Las Vegas, which would amount to something over 1,000 but less than 3,000 kilograms. Auricchio argued that he should only be held accountable for the 496 pounds actually delivered to Long Island because he did not know the specifics of the arrangements made by Adipietro in Las Vegas.

The district court found that the government did not carry its burden of establishing by a preponderance of the evidence that Auricchio knew the specifics of Adipietro's Las Vegas discussion. S.Tr. 27. However, the district court did find that the government had established that Auricchio knew Adipietro was involved in ongoing bulk purchases of marijuana and that there was no indication that Auricchio or Adipietro intended to withdraw from the

conspiracy. Therefore, the court found that it was reasonably foreseeable to Auricchio that Adipietro would arrange for and receive future shipments of marijuana and that Auricchio would have a role in unloading, preparing, and sorting those shipments. S.Tr. 25–26.[12] Noting that the first 446 pounds had been delivered over a 3–4 month period, the district court found that it was reasonably foreseeable to Auricchio that a similar amount would be delivered over a similar time span. Thus, the court held Auricchio responsible for 974 pounds (Base Offense Level 26), an amount of marijuana roughly twice the amount which had actually been delivered, excluding the controlled delivery of 50 pounds.

■ A district court's findings as to quantity of drugs attributable to a criminal defendant will not be overturned on appeal unless clearly erroneous. *United States v. Alexander*, 982 F.2d 262, 267 (8th Cir.1992) (citing *United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990)).

The standard for holding Auricchio responsible for future, undelivered shipments is not whether Auricchio had actual knowledge of the terms those shipments were to be delivered on. Rather the standard, as correctly applied by the district court, is whether those future amounts of marijuana were reasonably foreseeable to Auricchio. *United States v. North*, 900 F.2d 131, 132–33 (8th Cir.1990).

Auricchio knew from the time he entered the conspiracy that Adipietro intended to engage in on-going marijuana transactions and Auricchio willingly lent his services to Adipietro in handling these transactions. Furthermore, Auricchio's involvement was not that of a mere on-looker, "gofer," or guard: he helped unload marijuana, repackage it, and, on one occasion, provided

---

**11.** This includes the final fifty-pound controlled delivery.

**12.** The district court based this finding on four things:
  1. the evidence produced at trial,
  2. the fact that Adipietro told Auricchio when he first sought Auricchio's assistance that Adi-

pietro would be involved in future bulk purchases of marijuana,
  3. a statement by Auricchio's counsel on Auricchio's behalf in a letter to the probation officer dated March 12, 1992, and
  4. the nature and scope of Auricchio's role in the conspiracy.
  S.Tr. 27.

storage for a shipment of marijuana in his own home. Under these facts, the district court's finding that Auricchio could reasonably foresee future shipments of marijuana was not clearly erroneous.

## C. ISSUES RAISED BY SANCHEZ

### 1. Prosecution Witness's Statement at Trial

■■■ Prior to trial, the district court granted Sanchez's motion in limine to exclude all reference to the fact that Sanchez had a previous felony conviction until such time as Sanchez raised the issue himself though direct or cross-examination or by placing Sanchez's character into issue. At trial during the direct examination of government's witness Kaniss, Kaniss mentioned that Sanchez had been in prison.

The statement came up in the context of Kaniss's description of the conspiracy and how it started:

Q (by Mr. Ambrose, prosecutor) Could you describe the roles that you and Mr. Sanchez filled in this partnership?

A (by Kaniss, witness) My main role was to make sure that the marijuana was delivered to Philadelphia and the money got back from Philadelphia to Tucson. Ruben's [Sanchez's] main role was to gain access to the marijuana in Tucson from one or more of his sources and get it to Roy Jacoby's house to be packed and put on the road.

Q Could you tell us when that partnership developed?

A That partnership developed in the beginning of 1990.

Q Could you tell us how it developed?

A Well, Ruben [Sanchez] had just got out of prison in '88, and I ...

Trial Transcript at 758–59 (T.Tr. 758–59).

Following the statement, an objection was made and defense counsel for Sanchez

requested a mistrial on the basis that Kaniss's statement made it impossible for Sanchez to receive a fair trial. The district court denied Sanchez' motion for a mistrial and immediately instructed the jury as follows:

> Folks, you are instructed to disregard the last comment of the witness. Now, when I say disregard, what I'm really saying is it would be unfair, unfair for any of you to allow that comment to influence your assessment of this case in any way. Furthermore, it would be unfair for any of you to bring that statement up as part of the deliberations in this case. In other words, it would be unfair for you-all to bring that up and talk about it at the time you ultimately get around to discussing this case.
>
> I know, I'm confident that each of you are sitting there and your primary desire is to be fair. And I'm counting on that because it would be, as I say, very unfair for you to accept that statement and to then utilize it either for yourself or in discussing ultimately with other members of the jury when that time comes what that statement was or what it means. All right.

T.Tr. 768.

Sanchez argues that he is entitled to a new trial because the district court erred in not granting Sanchez's motion for a mistrial. Sanchez argues that the prejudicial nature of Kaniss's statement deprived him of a fair trial and that the district court's instruction to the jury failed to eradicate the effects of that statement upon the jury.

■■■ Kaniss's apparently inadvertent statement may have been improper.[13] However, the district court took immediate corrective action and it was the court's judgment that his instruction to the jury was sufficient to cure the error. A district court has broad discretion in determining whether an improper statement "has taint-

---

**13.** The government counsel argued at trial that, although he had cautioned Kaniss not to make reference to any prior drug dealings with Sanchez or to Sanchez's prior conviction, the statement was not necessarily improper. The government argued that the statement was admissible because Sanchez's prior conviction involved a prior conspiracy between Kaniss and Sanchez and that prior conspiracy explained the relationship in the conspiracy with which Sanchez was currently charged. We do not reach the issue of whether the statement was inadmissible because we find that, if it was, the district court's curative instruction remedied the error.

ed a trial to such an extent as to require a mistrial." *United States v. Alexander,* 982 F.2d 262, 266 (8th Cir.1992) (citing *United States v. Robinson,* 774 F.2d 261, 277 (8th Cir.1985)). *See also United States v. Boykins,* 966 F.2d 1240, 1244 (8th Cir. 1992) (citing *United States v. Pierce,* 792 F.2d 740, 742 (8th Cir.1986)) (holding mistrial not warranted after one brief improper response by a government witness which was not mentioned again during the trial). Here the district court carefully considered all the circumstances surrounding the statement [14] and decided that a curative jury instruction immediately given would suffice to correct the error. We find neither an abuse of discretion or plain error.

**2. Adjustment for Organizational or Leader Role**

■ At sentencing, the district court adjusted Sanchez's base offense level by four levels because of his role as a leader or organizer of the conspiracy pursuant to U.S.S.G. § 3B1.1(a). Sanchez argued before the district court and reasserts here that it is improper to apply this section to him because he had no control over other co-conspirators and no control over the marijuana once he supplied it.

Section 3B1.1(a) read as follows at the time of Sanchez's sentencing:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

U.S.S.G. § 3B1.1(a). Application note 3 to section 3B1.1(a) states that, in determining whether a defendant was a leader or organizer, the court should look to such factors as the defendant's decision making authority, participation in the offense, recruitment of accomplices, disproportional share of profits, degree of planning or organizing, nature and scope of the activity, and degree of control and authority over others. U.S.S.G. § 3B1.1(a), application note 3.

There can be more than one leader or organizer of a conspiracy. *Id.*

We review the district court's enhancement of Sanchez's sentence pursuant to section 3B1.1(a) under the clearly erroneous standard. *United States v. Harry,* 960 F.2d 51, 53 (8th Cir.1992); *United States v. Blandino,* 954 F.2d 1436, 1437 (8th Cir. 1992) (per curiam); and *United States v. Capps,* 952 F.2d 1026, 1027 (8th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 2978, 119 L.Ed.2d 596 (1992). Reversal of such an enhancement is warranted only where we are "left with a definite and firm conviction that a mistake has been made." *Harry,* 960 F.2d at 53 (citing *United States v. Williams,* 890 F.2d 102, 104 (8th Cir. 1989)).

■ The terms "leader" and "organizer" as used in section 3B1.1(a) are defined broadly. *Harry,* 960 F.2d at 54 (citing *United States v. Collar,* 904 F.2d 441, 442 (8th Cir.1990)). A defendant need not have direct control over others in the conspiracy in order to qualify as an organizer. *Harry,* 960 F.2d at 54 (citing *United States v. Johnson,* 906 F.2d 1285, 1291–92 (8th Cir. 1990)).

In this case, the district court's finding that Sanchez was a leader or organizer was based upon the evidence produced at trial and at the sentencing hearing. Sanchez was the sole conspirator in charge of the supply side of the conspiracy. S.Tr. 301–07. The district court analogized Sanchez's and Kaniss's roles as equal partners in the conspiracy, with Sanchez controlling the supply side and Kaniss controlling the distribution side. *Id.* In addition, the court also stated that the manner in which Sanchez stepped in to perform Kaniss's duties regarding transportation when Kaniss was unavailable was more consistent with a role of a co-leader rather than merely a case of the "janitor" answering the phone when the "president" is away. *Id.* at 306–07. Finally, the district court noted that when Sanchez's supply dried up, Sanchez recruited another party to join the conspiracy in order to provide a supply. The district

**14.** *See* T.Tr. 759–68.

court's finding that Sanchez was a leader or organizer is fully supported by the record in this case and the four-level enhancement is affirmed.

### 3. Enhancement for Obstruction of Justice

■ The United States Sentencing Guidelines provide that a defendant's sentence may be enhanced as follows:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

*Commentary*

*Application Notes:*

  \*   \*   \*   \*   \*   \*

3. The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies:
(a) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;

U.S.S.G. § 3C1.1 and application note 3(a). The district court enhanced Sanchez's sentence pursuant to section 3C1.1 because it found that Sanchez had attempted to procure the bodily injury of prosecution witness Jacoby in order to prevent him from testifying. Sanchez argues that the enhancement was improper because there was no reliable evidence supporting the district court's finding.

■ A district court's findings of fact in support of a section 3C1.1 enhancement

are reviewed on the clearly erroneous standard, *United States v. Larson,* 978 F.2d 1021, 1025 (8th Cir.1992) (citing *United States v. Shoulberg,* 895 F.2d 882, 885 (2d Cir.1990) (holding that review of the findings of fact supporting an obstruction of justice enhancement should be on the clearly erroneous basis)), and a district court's findings as to the credibility of a witness are "virtually unreviewable on appeal." *United States v. Candie,* 974 F.2d 61, 64 (8th Cir.1992) (citing 18 U.S.C. § 3742(e) and *United States v. Pou,* 953 F.2d 363, 370 (8th Cir.), *cert. denied,* — U.S. —, —, 112 S.Ct. 1982, 1983, 118 L.Ed.2d 580, 581 (1992)).

At the sentencing hearing, the government presented tapes and transcripts of Sanchez's communications from jail after his arrest as well as testimony from the recipient of these communications, Louise Walls (Walls).[15] Walls testified not only as to what Sanchez said to her, but also as to what she understood him to mean. *See* S.Tr. 22–143. Sanchez testified at the sentencing hearing that the object of his communications was not to see that Jacoby was harmed. Sanchez explained that the legitimate object of his communications was to obtain evidence with which to discredit Jacoby at trial. *See* S.Tr. 176–249.

The district court found that the government had proved by a preponderance of the evidence that Sanchez had attempted to bring about bodily harm to Jacoby and thus had obstructed justice. S.Tr. 322–23. The court based its finding on the nature of what Sanchez said in his jail communications, his tone of voice in saying it, and the roundabout way he said it.[16] Even without

---

15. Walls is the wife of prosecution witness Kaniss.

16. The court stated as follows:
I do not agree ... that the language I heard was innocuous, or the language I heard in the tapes was innocuous or that the language, the words I read on paper were innocuous. Anybody listening to tape 67 and then reading transcript, 67A, would, I think, be struck, as I was, by the blizzard of indirection in the sense of the tremendous amount of words that came from Sanchez to Walls.
 The tone of voice that was used for 95 percent, 98 percent of the time. Then you

will notice the change on Page 15 of the transcript, but it's a very brief change, not lengthy. It's like searching for a contact lens in the sink. You can stare and stare and attempt to get an angle to see something reflecting and then after searching for what seems like a lengthy time and a tremendous amount of sink, you suddenly find it. But it's a very, very small part of the total area that was searched that was relevant.
 The tone communicates something is up, ... something that is not on the up and up was being referred to. Had the purpose of a good deal of this been as Mr. Sanchez testified to be a legitimate effort to try to bring to the

Walls' testimony, the court stated it was obvious from Sanchez's communications that "something was afoot." S.Tr. 322. Furthermore, the court expressly found Walls' testimony to be "very credible." Id.[17]

We do not find the district court's findings to be clearly erroneous.

## CONCLUSION

None of the appellants have presented arguments justifying a reversal of his conviction or a remand for resentencing. The district court's sentencing hearings were thorough as to the issues raised. We find no error. Accordingly, the convictions and sentences of all three appellants are affirmed.

courtroom adverse information about a potential witness, why all the indirection and the vague kind of language? I observed Mr. Sanchez here on the stand. He can talk very directly when he wants to. He has an excellent vocabulary, a good use of the language. If all this was about was as straightforward and understandable as attempting to get legitimate information to discredit a witness in the courtroom, one doesn't need the indirection and obtuse language.

S.Tr. 320–22.

**17.** This finding of credibility was based on Walls' demeanor and appearance while testifying. S.Tr. 322. The court noted some minor inconsistencies in her testimony and stated that this was more supportive of her credibility than if she had recalled everything with "absolute precision." *Id.*