UNITED STATES of America, Plaintiff,

v.

**Damion E. JOHNSON and Henry R. Valdez, Defendants.**

**Nos. 4:CR96–3057, 4:CR96–3058.**

United States District Court, D. Nebraska.

Oct. 6, 1997.

Alan L. Everett, Assistant United States Attorney, Lincoln, NE, for Plaintiff.

John C. Vanderslice, Assistant Federal Public Defender, Lincoln, NE, for Defendant Johnson.

Gary R. Pearson, Lincoln, NE, for Defendant Valdez.

## MEMORANDUM AND ORDER

KOPF, District Judge.

A jury convicted both defendants of attempted bank robbery and use of a firearm during a felony crime of violence. Before sentencing, the following motion and objections to the presentence reports remain for resolution:

(1) the government's motion for an obstruction of justice enhancement or upward departure that alleges that each defendant attempted to harm a witness—the president of the bank—and thus each man obstructed justice under U.S.S.G. § 3C1.1;

(2) Damion E. Johnson's (Johnson) objections to the presentence report (PSR) that assert: (a) an objection to the conclusion (PSR ¶ 63) that the shotgun involved in the crime was a "short-barreled" shotgun within the meaning of 18 U.S.C. §§ 921(a)(5), 921(a)(6) & 924(c)(1) (mandating a consecutive ten-year sentence); (b) an objection to the conclusion (PSR ¶ 31) that two points should enhance the base offense level pursuant to U.S.S.G. § 3C1.2 because of reckless endangerment during flight; (c) an objection to the conclusion (PSR ¶¶ 43–45) that Johnson has five criminal history points because the juvenile court adjudication (attachment to PSR) is invalid and, due to the invalidity of that adjudication, an Enhancement for commit-

ting the present offense within two years of release from detention is also invalid;

(3) Henry R. Valdez' (Valdez) objection to the conclusion in the presentence report (PSR ¶ 78) that the shotgun involved in the crime was a "short-barreled shotgun" within the meaning of 18 U.S.C. §§ 921(a)(5), 921(a)(6) & 924(c)(1) (mandating a consecutive ten-year sentence).[1]

We held a two-day evidentiary hearing on the motion and objections. The parties have now submitted their post-hearing briefs. After careful consideration, the government's motion will be granted and each defendant will receive a two-point enhancement for obstruction of justice. In addition, we will deny the objections of the defendants to their presentence reports. The reasons for these rulings are set forth below.

## I. Obstruction of Justice—Attempt to Harm the Bank President

The government claims that Johnson and Valdez willfully obstructed justice and should receive a two-point enhancement pursuant to U.S.S.G. § 3C1.1. If a defendant willfully attempts to "threaten[ ], intimidate[ ], or otherwise unlawfully influenc[e] a ... witness ... directly or indirectly," the offense level is increased by two levels. *Id.* comment. (n.3(a)). *See, e.g., United States v. Adipietro*, 983 F.2d 1468, 1479 (8th Cir.1993) (regarding the government's claim that the defendant asked a third party to harm a government witness, evidence concerning nature of what was said, tone of voice, and roundabout nature of the way of saying the words was sufficient to support enhancement under U.S.S.G. § 3C1.1); *United States v. Capps*, 952 F.2d 1026, 1028 (8th Cir.1991) (the statement in the presence of a bartender that "Mike Harry was snitching on her and that she was bringing in some bikers to kick his ass and deal with the snitch" was not idle bar talk and warranted enhancement pursuant to U.S.S.G. § 3C1.1), *cert. denied,* 504 U.S. 990, 112 S.Ct. 2978, 119 L.Ed.2d 596 (1992).

Here, the government alleges that the defendants attempted to have the bank presi-

---

1. Valdez had not filed an objection raising this issue, but he was given leave to raise the issue without a filed objection because the issue had been properly raised by Johnson.

dent killed or harmed to stop him from testifying against them at trial or sentencing or to retaliate for giving testimony against them.[2] The bank president was a primary witness to the attempted robbery. I find and conclude that the government has overwhelmingly proven its allegations.

During and after the trial of this case, we held both defendants in the Lancaster County Jail. The jail allowed the men to talk on the telephone and to have visitors. The government claims that the defendants attempted to orchestrate their plan from the jail.

The government's first witness was Melvin Denny Lear (Lear). Lear was friendly with Johnson and Valdez. He was obviously hostile to the government.

Lear reluctantly admitted that he had a telephone conversation with Johnson while Johnson was in the jail. This conversation took place shortly before or during trial. He also admitted that he had conversations with Valdez during this time. During one conversation, both Johnson and Valdez spoke with Lear by having Valdez relay information from Johnson. (1 Tr. 43.)

Lear stated that Johnson talked about "wish[ing] something would happen" to the bank president such as a "natural disaster" or a "heart attack." (1 Tr. 26.) Lear also admitted that Valdez asked Lear whether "I could get a gun." (1 Tr. 34.) Lear also admitted that Valdez talked to him about "getting a bunch of guys" and "doing something to the bank president." (1 Tr. 45.)

Lear denied that Johnson or Valdez seriously threatened the bank president or seriously asked Lear to harm the bank president. Lear also denied taking any steps to harm the bank president. As for these denials, I find that Lear was lying.

**2.** The government suggests that Johnson and Valdez attempted to accomplish this goal by having others harm the bank president and by enlisting others to assist the defendants in escaping so that the defendants could harm the bank president.

**3.** At this point in the hearing, Valdez screamed, "you ought to be ashamed of yourself, his uncle, testifying against your own fucking nephew." (1 Tr. 67.) I have not drawn any negative inferences against Valdez or Johnson from this outburst.

Jim Hughes testified. Mr. Hughes is Johnson's uncle. Hughes testified that during a conversation with Johnson at the jail, Johnson told his uncle that he "he'd like to escape" and "kill [the bank president]." (1 Tr. 67.) [3] Hughes also testified about a conversation with Lear. Lear told Hughes that Johnson wanted Lear to help him escape (1 Tr. 81) so that Johnson could "do the bank manager." (1 Tr. 82.)

Lisa Hanks gave testimony. She said that Lear asked her to drive Lear and his friends to the bank president's home "so that he could kick [the president's] ass." (1 Tr. 58.) Hanks also heard Lear making telephone calls to friends to obtain assistance in assaulting the witness.

Robert Nelson also appeared at the hearing and testified. Nelson recounted a telephone conversation with Lear. During this telephone conversation, Lear "said he was going to get a couple other guys to go hurt some president and he wanted me to be involved in the beat down." (1 Tr. 100.) Lear told Nelson that two of Lear's friends had been "narked off" by the president, and one of those friends was Henry Valdez. Nelson could not remember the name of the other friend.

 [■] Kenneth Anderson testified. Anderson's stepdaughter dated Corky Graves. Valdez is Graves' brother. Before trial, Anderson had taken Graves to visit Valdez at the jail. Anderson saw Graves talk to Valdez on a phone in the jail. After this conversation and on the way home, Graves began to cry. When Anderson asked what was wrong, Graves told him that Valdez "had asked Corky Graves to either knock off the bank president or find someone that would." (1 Tr. 118.) [4]

**4.** Even though Graves was not present at the hearing, Graves' statement was admissible as an excited utterance under Federal Rule of Evidence 803(2). To the extent that Graves' statement included words spoken by Valdez, those words are not hearsay under Federal Rule of Evidence 801(d)(2)(A). Even if Graves' statement was not admissible under the Rules of Evidence, the evidence was sufficiently reliable to be used against Valdez for purposes of sentencing. I have not considered the statement as evidence against Johnson.

The government produced evidence that Graves, although subpoenaed to attend the hearing on the government's motion, was hiding. When Graves failed to attend the first hearing, an effort was made to find Graves before the second hearing commenced. During this time, an FBI agent learned that Graves had told his employer that he would be gone until the day after the second hearing. The agent learned that Graves would not tell his employer where he could be found because "he didn't want to put his family or his employers in a position of having to either say where he was or tell a lie to the authorities." (2 Tr. 13.)

Johnson and Valdez claim that the witnesses against them are not credible, and that the evidence does not establish a serious attempt to harm the bank president. Suffice it to state that I found the government's evidence very persuasive. I have no doubt that both defendants willfully attempted to have the bank president harmed to silence or punish him. As a result, I will grant the government's motion. Both Johnson and Valdez will be assessed two points pursuant to U.S.S.G. § 3C1.1.[5]

## II. Johnson's Objections to PSR

### A. "Short" Shotgun

At trial, the president of the bank testified that Johnson entered the bank carrying a shotgun. When Johnson became impatient, he jammed the gun in the man's neck.

The gun was found when the vehicle Johnson was driving was stopped after a high-speed chase. The gun was then sent to the Nebraska State Crime laboratory. An expert witness for the government testified that the gun was a fully functional "Ted Williams model 200, pump 12 gauge shotgun." (Ex. 205 at 362 (Trial Test. of Expert).)

Using a "crude" process, the barrel of the gun had been shortened to 16 inches. (*Id.* at 364.) In addition, the stock had been partially cut off, exposing the bolt that holds the stock to the barrel. (*Id.* at 365.) The remaining stock was fashioned into "a pistol

grip." (*Id.*) The overall length of the gun is 27.5 inches. (*Id.* at 365.) The expert stated that, before these modifications, "this was a shotgun that [was] intended to be fired from the shoulder." (*Id.* at 365–66.)

If a person commits a crime of violence using a "short-barreled shotgun," the perpetrator is subject to a minimum ten-year prison sentence and such sentence must be served after the service of any related sentences. 18 U.S.C. § 924(c)(1) (definition of crime and statement of penalties). *See also* 18 U.S.C. §§ 921(a)(5) (definition of "shotgun") & 921(a)(6) (definition of "short-barreled shotgun").

Johnson claims that the gun at issue is not a "short-barreled shotgun." His argument is primarily predicated upon an interpretation of the definitions found in 18 U.S.C. §§ 921(a)(5) & 921(a)(6).

Among other conditions, section 921(a)(5) defines a "shotgun" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder...." Section 921(a)(6) states: "The term 'short-barreled shotgun' means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches."

Because the shotgun at issue is longer than 26 inches, Johnson first argues that the gun is not "short-barreled" as far as the overall length of the weapon is concerned. With this much, I agree.

Though the gun has a barrel that is 16 inches long and therefore the gun falls within the "less than 18 inches" classification proscribed by 18 U.S.C. § 921(a)(6), Johnson argues that the weapon is not a "shotgun" under section 921(a)(5). This is because the gun now has a "pistol grip." Consequently, Johnson asserts that the gun is not *now* "intended to be fired from the shoulder" within the meaning of section 921(a)(5). So, Johnson claims that the statute does not

---

5. In the absence of section 3C1.1, I would have departed upward two points pursuant U.S.S.G. § 5K2.0 because the serious attempt to harm the

bank president would then be far outside the "heartland."

proscribe the gun because the gun, although having a barrel less than 18 inches in length, is not a "shotgun"; that is, the gun is no longer intended to be fired from the shoulder.

I reject Johnson's argument. The statute only requires that the gun be intended to be fired from the shoulder at some point during its "design[ ] or redesign[ ], ma[king] or rema[king]." 18 U.S.C. § 921(a)(5). The undisputed evidence establishes that before the "crude" modifications, "this was a shotgun that [was] intended to be fired from the shoulder." (Ex. 205 at 365–66.) So, the gun, having barrel of less than 18 inches, fits the statutory definition of a "short-barreled shotgun."

■ Johnson also argues that the first prong of section 921(a)(6) pertains to short-barreled shotguns that are *unmodified* (unmodified guns with barrels of less than 18 inches) while the second prong of the section pertains to *modified* shotguns (modified shotguns that are less than 26 inches in total length). From this assertion, Johnson argues that the gun in question was obviously modified, but it is also longer than 26 inches in total length. Therefore, he argues that the gun is not proscribed since it does not fall within either prohibited category; that is, the gun is not an *unmodified* shotgun with a barrel of less than 18 inches and, while the gun has been modified, it is longer than 26 inches.

I reject Johnson's argument. The plain language and structure of the statute reveal that it was "intended to proscribe the use of both shotguns with a barrel length of less than eighteen inches and other weapons made from shotguns with an overall length of less than twenty-six inches." *United States v. Hall*, 972 F.2d 67, 70 (4th Cir.1992) (construing meaning of 18 U.S.C. § 921(a)(6)).

A common sense view of the statute also supports this reading of the statute. *Id.*. Congress intended to proscribe shotguns that were easy to conceal because the total length of the weapon had been reduced. *Id.;* 18

U.S.C. § 921(a)(6), cl. 2. Still, Congress *also* wanted to prohibit the use of shotguns with short barrels, whatever the length of the entire gun. *Id.;* 18 U.S.C. § 921(a)(6), cl. 1. This is because "shot scatters more widely from a short barrel, thus killing indiscriminately." *Hall*, 972 F.2d at 70.

As a result, Congress dealt with the ease by which a shortened shotgun could be concealed. Nevertheless, Congress also "addressed its concern over the indiscriminate violence of sawed-off shotguns by punishing the use of *any shotgun with a barrel of less than eighteen inches, regardless of the gun's overall length. This portion of the statute recognizes that because shortened barrels scatter shot indiscriminately they are especially dangerous, even if difficult to conceal."* *Id.* (emphasis added).

■ Finally, Johnson argues that the government failed to prove that he *knew* the shotgun had a short barrel. Assuming the government has the burden to prove such knowledge [6], even a cursory examination of the weapon (which we received in evidence at the trial as Exhibit 4) proves that Johnson must have known that the barrel was shortened to an illegal length when he carried it into the bank and jammed it into the back of the terrified bank president's neck. *See, e.g., United States v. Barr*, 32 F.3d 1320, 1324 (8th Cir.1994) ("The Government need only prove that the defendant possessed the 'quasi-suspect' weapon and observed its characteristics. A defendant who observes such a weapon cannot possess it with innocence.") (Prosecution for possession of unregistered sawed-off shotgun under 26 U.S.C. § 5861(d) & (i)).

In summary, the government has proven that the weapon was a "short-barreled shotgun." Accordingly, we will deny Johnson's objection.

### B. "Reckless Endangerment"

■ U.S.S.G. § 3C1.2 states: "If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law

---

**6.** The premise of Johnson's argument—that the statute requires the government to prove the defendant knew the barrel length—is probably incorrect. *United States v. Dewalt*, 92 F.3d 1209, 1212 (D.C.Cir.1996) ("We find that proposition dubious.").

enforcement officer, increase by 2 levels." Here the probation officer increased Johnson's offense level by two points pursuant to section 3C1.2. Johnson argues that the government failed to prove that he "recklessly endangered" anyone. I strongly disagree.

After the robbery, Johnson and Valdez escaped in a truck. Johnson drove the vehicle. Valdez was a passenger.

Soon after leaving the bank, a state police officer saw the truck and began to follow it. (Ex. 206, Trial Test. of State Trooper.) Johnson noticed the surveillance and fled at high speed in an attempt to elude the officer Turning on his flashing lights and siren, the trooper pursued the truck. The chase covered a distance of four to four and one-half miles over mostly gravel roads. The trooper had difficulty seeing due to the dust being thrown up by the fleeing vehicle. As a result, the officer followed at a distance of about 300 feet. During this time, Johnson's vehicle reached speeds of 70 to 80 miles per hour. Luckily, Johnson's vehicle did not encounter any other motorists.

After hearing radio traffic from the pursuit vehicle, two other state troopers hastily created a roadblock at the intersection of a county road and a main highway. To protect motorists on the main highway in the event the troopers were unable to stop Johnson's vehicle, the officers parked their cars to block traffic on the main highway. The two troopers then took positions standing on the county road. They aimed their weapons at the onrushing vehicle. Johnson did not stop until one trooper fired a round from his shotgun at the oncoming truck.

If this undisputed evidence does not prove "reckless endangerment," I cannot imagine what evidence would be sufficient to do so. Johnson recklessly endangered the lives of at least three state troopers, and the motoring public overall. Accordingly, his objection is without merit, and I will deny it.

---

7. The evidence establishes that the attempted bank robbery took place on October 1, 1996, and that Johnson was released from the juvenile prison on October 11, 1994.

8. The record also establishes Johnson admitted the allegations of the petition; that is, "Mr. Damion Johnson was sworn and testified that the

## C. "Uncounseled Conviction"

Johnson claims that his juvenile adjudication (conviction) which resulted in his placement in a juvenile detention facility was uncounseled. Consequently, Johnson argues that he should not have been assessed two points for that adjudication under U.S.S.G. § 4A1.2(d)(2)(A) (counting certain offenses committed before age 18). He also claims that because of the invalidity of the juvenile adjudication, the probation officer erred when he enhanced the criminal history score by two points under U.S.S.G. § 4A1.1(e) (increasing the criminal history score when instant offense takes place within two years after the defendant is released from prison).[7]

Juvenile court records prove that before the adjudication upon his admission of the charges, "[r]ights and warnings were given pursuant to Neb.Rev.Stat. § 43–279." (Ex. 207A.) The record further proves that "Mr. Damion Johnson and his mother waived their right to appointment of counsel." (*Id.*)[8]

Neb.Rev.Stat. § 43–279(1)(a)–(g) (Michie 1995) provides in part that when a juvenile and his parent appear before a Nebraska juvenile court, the judge must inform the juvenile of: (a) the nature of the proceedings and the possible consequences; (b) the juvenile's right to appointed counsel paid for by the county; (c) the privilege against self-incrimination; (d) the right to confrontation and the right to cross-examine adverse witnesses; (e) the right to testify and to compel others to testify; (f) the right to a speedy adjudication; and (g) the right to appeal and the right to a transcript for appeal. The court may not accept any admission by the juvenile until "the court has determined from examination of the juvenile and those present that such admission is intelligently, voluntarily, and understandingly made and *with an affirmative waiver of rights* and that a factu-

---

admission was given voluntarily, knowingly and intelligently." *Id.* Furthermore, Johnson's mother told the court that it "could accept the admission made by Mr. Damion Johnson." (*Id.*) A factual basis was provided by a prosecutor and Johnson confirmed the truth of the factual basis. (*Id.*)

al basis for such admission exists." *Id.* (emphasis added).

After Johnson admitted the allegations of the petition, the court recessed the proceedings pending receipt of a juvenile probation officer's report regarding disposition (sentence). (Ex. 205A.) The juvenile court records reflect that a disposition hearing was held some months later. (*Id.*)

During the interim, Johnson lived with his aunt and uncle. (2 Tr. 58.) After talking to the juvenile probation officer about recommendations she was contemplating, Johnson complained to his grandmother about what the probation officer had told him. (2 Tr. 59.) His grandmother then hired Peter Blakeslee [9], and "he explained to me, you know, my options." (2 Tr. 60.) According to Johnson, Blakeslee "[b]asically told me that the record would be sealed, and nobody would look into it." (2 Tr 61.)

At that disposition hearing, Johnson "appeared with his mother . . . and his attorney, Mr. Peter Blakeslee." (Ex. 207A.) The court "proceeded to inquire into the matter of the proper disposition," "[s]tatements were made to the court on disposition," and "the statements were duly considered by the court." (*Id.*) The court then proceeded to disposition.

There is no evidence that Johnson, his mother, or his attorney sought to set aside the prior adjudication because of an invalid waiver of counsel. Everyone was apparently satisfied with the fairness of the previous adjudication and waiver of counsel.

Johnson testified at the evidentiary hearing here. Essentially, he said that his mother and stepfather told him to waive his right to counsel, and that he did so on their advice. He now claims that he did not really know what he was doing, and that his waiver was the fault of his parents.[10]

In short, I do not believe Johnson's testimony regarding his waiver of counsel. On the contrary, I find and conclude that the government has carried its initial burden of proving the fact of conviction. *See, e.g., United States v. Strange,* 102 F.3d 356, 362–63 (8th Cir.1996) (while the government has the burden to prove the state court conviction, the defendant has the burden to establish that the conviction was invalid because the defendant did not knowingly and intelligently waive right to counsel). I further find and conclude that Johnson "has completely failed to carry his burden of demonstrating that his state court conviction was constitutionally infirm." *Id.* at 362. As a result, I will deny Johnson's objection.[11]

### III. Valdez' Objection to PSR

 Valdez also objects to the probation officer's determination that there was a "short-barreled shotgun" involved in the crime.[12] Valdez makes a different argument than the one advanced by Johnson. He asserts that in order for the government to prove that the "shotgun" was a "short-barrel" shotgun, the government must prove that the barrel was less than 18 inches *and* the total length of the gun was less than 26 inches.

Valdez' argument is predicated upon the use of the word "and" in section 921(a)(6). 18 U.S.C. § 921(a)(6) ("The term 'short-barreled shotgun' means a shotgun having one or more barrels less than eighteen inches in length *and* any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.") (emphasis added).

Valdez points out the while the shotgun at issue here has a short barrel (16 inches), the

---

9. The court is familiar with Mr. Blakeslee, and knows him to be an experienced criminal defense lawyer.

10. This propensity to blame others is documented in the juvenile court records. For example, one report recounted that Johnson "wanted to blame everyone else for his problems [and he] carried a grudge against his mother." (Ex. 207.)

11. To the extent that Johnson attacks the assessment of one criminal history point for a misde-

meanor conviction described in paragraph 42 of the PSR, the government has proven the conviction. (Ex. 207, last two pages.) Moreover, the evidence reveals that Johnson pled guilty and was represented by the public defender. (*Id.*)

12. For purposes of sentencing, Valdez does not contest that he used the weapon or aided and abetted the use of the weapon.

total length of the weapon exceeds 26 inches. Therefore, he argues that the gun does not fit the statute because the gun does not meet both the barrel length criteria and the total length criteria. In support of his argument, Valdez asserts that certain weapons are commercially manufactured and sold which have barrels that are less than 18 inches in length but are longer than 26 inches in toto. (Ex. 301 (brochure on Benelli Security Shotguns) (M1 Entry Gun).) Valdez argues that commercial manufacturers would not make such guns if they thought the guns were illegal. As a result, Valdez asserts that his reading of section 921(a)(6) is correct.

I reject Valdez' argument. His argument has been considered before and rejected. *Hall,* 972 F.2d at 69–70 (where a defendant argued that "only a shotgun with a barrel length of less than 18 inches and an overall length of less than 26 inches falls within the statute," the Fourth Circuit held that such an "interpretation, however, is contrary to the plain meaning of the statute.") (construing 18 U.S.C. § 921(a)(6)).

The Fourth Circuit rejected this argument "[b]ecause Congress used two distinct subjects, each with its own modifying clause" and "the most natural reading of the provision is that Congress intended to punish the use of two distinct types of firearm." *Id.* at 70. I agree with the *Hall* court's analysis of section 921(a)(6). Accordingly, I reject Valdez' objection.[13]

IT IS ORDERED that:

1. The government's motion (filing 61 in 4:96CR3057 and filing 67 in 4:96CR3058) is granted, and both Johnson and Valdez will be assessed two points pursuant to U.S.S.G. § 3C1.1.

2. Johnson's objections (filings 59 and 66 in 4:96CR3057) are denied.

3. Valdez' objection is denied.

---

**13.** Insofar as the "Benelli" brochure is concerned, for a variety of reasons I find the document to be meaningless. In particular, the brochure proves nothing because, as the face of the document reveals, it was intended for distribution to the "Military & Law Enforcement." (Ex.

---

301.) The provisions of Chapter 44 relating to firearms, of which section 924(c) is a part, do not generally pertain to shotguns sold to "the United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof." 18 U.S.C. § 925(a)(1).