# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-3467

_____

United States of America,                    *
                                             *
        Plaintiff-Appellee,              *
                                             *
v.                                           *
                                             *
Robert Francis,                              *
                                             *
        Defendant-Appellant.             *

_____               Appeals from the United States
                       District Court for the Eastern District
No. 02-3498           of Missouri.
_____

United States of America,                    *
                                             *
        Plaintiff-Appellee,              *
                                             *
v.                                           *
                                             *
Germaine Davis, also known as Gary           *
Henderson,                                   *
                                             *
        Defendant-Appellant.             *
                                             *

_____

No. 02-3964

_____

| United States of America, | * |
| | * |
| Plaintiff-Appellee | * |
| | * |
| v. | * |
| | * |
| Anthony Francis, | * |
| | * |
| Defendant-Appellant. | * |
| | * |

_____

No. 02-3965

_____

| United States of America, | * |
| | * |
| Plaintiff-Appellee, | * |
| | * |
| v. | * |
| | * |
| Leo Muhammad, | * |
| | * |
| Defendant-Appellant. | * |
| | * |

_____

Submitted: June 12, 2003
Filed: May 12, 2004     (Corrected: 05/26/04)
_____

Before MELLOY, BEAM, and SMITH, Circuit Judges.
_____

MELLOY, Circuit Judge.

A jury convicted defendants Robert Francis, Anthony Francis, Leo Muhammad and Germaine Davis of conspiring to distribute and possession with intent to distribute more than five kilograms of cocaine. Defendants raise the following issues on appeal: (1) whether the evidence presented at trial was sufficient to support their convictions; (2) whether the indictment and jury verdicts were deficient under Apprendi v. New Jersey, 530 U.S. 466 (2000), or United States v. Cotton, 535 U.S. 625 (2002); (3) whether the district court erred in assessing the quantity of drugs attributable to each defendant; (4) whether the district court erred in applying an enhancement to the sentences of Robert Francis, Anthony Francis and Leo Muhammad for their roles in the offense; (5) whether the district court erred in applying a firearm enhancement to the sentences of Robert Francis, Anthony Francis and Germaine Davis; (6) whether the search of Germaine Davis's apartment violated his Fourth Amendment rights; (7) whether the district court erred in dismissing a juror; (8) whether the government engaged in misconduct by contacting a defense witness before he testified at trial; (9) whether the district court erred in denying Leo Muhammad's motion to sever; and (10) whether the district court erred in disqualifying Robert Francis's attorney, David Dudley. For the reasons discussed below, we affirm the district court.[1]

I.    BACKGROUND

Authorities began investigating the drug operation at issue in this case in 1999. The investigation revealed that Freddie Burgueno supplied large quantities of cocaine

_____

[1] The Honorable Catherine D. Perry, United States District Court Judge for the Eastern District of Missouri.

to Robert and Anthony Francis, who in turn supplied Garrett Parker, Leo Muhammad, and others. Appellants and nine codefendants were charged in a one-count indictment with conspiracy to distribute and possession with the intent to distribute over five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Several codefendants, including some couriers for the organization, pled guilty and testified at the trials below. Davis, Muhammad, Anthony Francis, and Robert Francis were found guilty and were sentenced to 235 months, 360 months, 420 months and life, respectively.[2]

A. Robert Francis

On June 24, 1999, a postal inspector in Los Angeles, California discovered two suspicious packages, each containing $6000 in cash. The money was wrapped in carbon paper and concealed in videocassette tapes that had their inner workings removed. The return address on the packages was Gateway Productions in St. Louis, Missouri. After conducting fingerprint analysis, investigators believed that Robert Francis mailed the packages.

Postal inspectors later discovered similar packages sent from Gateway Productions in St. Louis to Los Angeles. Investigators opened approximately twenty of these packages pursuant to search warrants and found currency totaling more than $100,000 within hollowed videocassettes. Investigators documented the currency found, replaced it, and sent the packages to their destinations in furtherance of the investigation.

---

[2] A jury convicted Robert Francis, Muhammad and Davis in the first trial but did not reach a verdict as to Anthony Francis. Anthony Francis was convicted upon his re-trial.

A search of post office records revealed that 247 packages had been mailed by Gateway Productions to Los Angeles in 1999. By extrapolation, it was determined that more than $1,000,000 was mailed during that time period. At trial, Inspector Dennis Simpson testified that fingerprint analysis, physical surveillance, and camera surveillance led investigators to believe that Robert Francis mailed 240 of those packages, and that Robert's brother, Anthony Francis, mailed one package containing $18,500.

On October 8, 1999, a uniformed police officer stopped Anthony Francis outside his St. Louis apartment after learning of an outstanding warrant for his arrest. The officer seized a loaded .22 caliber revolver from Anthony Francis's front pocket along with a business card for a St. Louis hotel with a room number written on the back. This was later identified as the room of Timothy Doyle, a courier for defendants' drug organization. The arresting officer also seized Anthony Francis's cellular telephone, the memory of which contained several coconspirators' telephone numbers.

B. Tiffany Barry

In January 2000, as a result of surveillance conducted at the Francis brothers' apartment, investigators obtained a court order to place a global positioning system on the vehicle of Tiffany Barry, a suspected courier for the Francis operation. The global positioning system tracked Barry as she traveled from the Francis brothers' apartment to McAllen, Texas. On Barry's return to St. Louis, a Missouri State Highway Patrolman stopped her for speeding. The patrolman obtained consent to search Barry's vehicle and discovered 7.8 kilograms of cocaine in an electronically-controlled compartment behind the rear seat of the vehicle.

Barry was charged with conspiracy to distribute and possession with the intent to distribute cocaine. She pled guilty and agreed to testify at the trial below. Barry

testified that she began working as a courier for the Francis brothers in 1998.  On her first five assignments, she flew to Los Angeles and drove back to St. Louis in a car loaded with cocaine while one or both of the Francis brothers followed in a separate vehicle.  Sometime in early 1999, Barry began to drive to Los Angeles rather than fly, transporting drug money to Los Angeles and cocaine to St. Louis.  Barry received approximately $2500 for each of these trips.

Later in 1999, Barry made three similar trips to Indianapolis, Indiana, five to Chicago, Illinois, two to Memphis, Tennessee, and four to McAllen, Texas, all at the request of one or both of the Francis brothers.  Barry testified that Anthony Francis coordinated the Chicago trips with Freddy Burgueno, the supplier of the organization's cocaine.  Burgueno accompanied Anthony Francis on the first Chicago trip and conversed by telephone with him on the others.  Barry also testified that she, Parker and Davis unsuccessfully attempted to pick up cocaine in Atlanta, Georgia on one occasion.

C.  Homer Harris

After Barry's arrest, the investigation of the Francis organization stalled until late in the summer of 2000.  At that time, Drug Enforcement Agents in Springfield, Illinois, in an unrelated investigation, learned that another suspected drug dealer, Homer Harris, obtained cocaine from sources in St. Louis.  Those sources were later identified as Germaine Davis and Garrett Parker. Wiretap evidence introduced at trial suggested that Parker purchased his cocaine from the Francis brothers.

On August 2, 2000, agents observed Harris traveling from Springfield, Illinois to Davis's apartment building.  Harris entered the building with an empty white plastic bag and exited ten minutes later, at which time the bag appeared to be full. After Harris left Davis's apartment building, an Illinois State Trooper drove past him with his emergency lights flashing but did not stop Harris.  Thereafter, Harris stopped

his vehicle, and his passenger placed the plastic bag on the side of the highway. Another agent retrieved the bag and discovered 2.69 kilograms of cocaine in it.

Harris was charged with conspiracy to possess with the intent to distribute cocaine and cocaine base. He testified at the Francis trial pursuant to his plea agreement. Harris stated that he began buying cocaine from Parker in late 1998 or early 1999, initially purchasing nine ounces at a time and progressing to 2.5-kilogram quantities by the summer of 2000. Harris made the larger purchases at Davis's apartment. Davis was present during at least two of these transactions. Harris also obtained five kilograms of cocaine directly from Davis. Wiretap evidence introduced at trial corroborated Harris's testimony and revealed that Davis stored and packaged cocaine for Parker.

D. Harry Anderson

Due in part to information obtained from the Springfield agents and the seizure of Harris's cocaine, wiretaps were placed on telephone lines used by Parker and Robert Francis. Through these wiretaps, investigators learned that Parker planned to sell cocaine to coconspirator Harry Anderson on September 13, 2000. Officers followed Anderson that evening as he traveled from his house to the home of Parker's mother in Alton, Illinois. Anderson stayed in the house for a few minutes and then exited carrying a plastic bag. Shortly thereafter, a uniformed officer stopped Anderson, obtained consent to search his vehicle, and discovered more than 970 grams of cocaine in the plastic bag. Anderson was arrested and charged in the Francis indictment. He testified at trial after pleading guilty.

Anderson admitted that he began purchasing cocaine from Parker in 1995. The volume of his purchases increased gradually, peaking at one kilogram per week by 2000. Davis was present for some of the transactions. On one occasion, Anderson saw Davis give Parker a brown paper bag containing a kilogram of cocaine.

Anderson also testified that he saw Davis's car on the premises during the September 13, 2000 transaction.

### E. Other Cooperating Couriers

Through wiretaps and surveillance, investigators learned that Malarie and Johnny Macon, Timothy Doyle, and Timothy Hargrove worked as couriers for Robert Francis's organization. These individuals were charged with various drug crimes, most of which related to the drug activity of the Francis organization. They pleaded guilty and testified at the trial below pursuant to their plea agreements.

#### i. Malarie and Johnny Macon

Malarie Macon testified that Muhammad introduced her to the Francis brothers in 1995. Sometime in early 1999, Robert Francis asked her to drive from St. Louis to Chicago and retrieve a package at the airport. Malarie Macon agreed. When she arrived at the airport, Robert Francis placed a box weighing approximately thirty pounds in the trunk of her vehicle. Malarie Macon then followed him back to St. Louis. Robert Francis paid Malarie Macon $1,000 for this trip.

Later in 1999, Malarie Macon made three more trips to Chicago and four to Memphis at Robert Francis's request. During these trips, Malarie Macon picked up packages of drugs at airports and drove them back to St. Louis while Robert Francis followed her in a separate vehicle. In October 1999, Malarie Macon flew to California for Anthony Francis. Upon her arrival in California, Muhammad picked up Malarie Macon in a rental truck which she then drove back to St. Louis. Anthony Francis paid Malarie Macon $3500 for this trip.

Malarie testified that she took six more trips to California for Robert Francis in 2000. Malarie traveled alone on the first two, and her father, Johnny Macon,

accompanied her on the others. The Macons were contacted by Muhammad during three of the four trips they took together. On one occasion, Muhammad picked them up at the airport. On another, he instructed them on different driving routes to take out of Los Angeles.

In October 2000, Johnny Macon drove to California by himself in a green Cadillac provided by one of the Francis brothers.[3] Upon Macon's arrival in Los Angeles, Robert Francis took the Cadillac to the Wesley Social Center and loaded it with cocaine. He then returned the vehicle to Johnny Macon and told him to contact Anthony Francis once he arrived in St. Louis. On Johnny Macon's return trip, a Kansas Highway patrolman stopped him for a traffic violation. Johnny Macon consented to a search of the vehicle, and the trooper found more than 8.5 kilograms of cocaine in an electronically controlled secret compartment behind the rear seat. Johnny Macon was arrested two days later. After Anthony Francis bailed him out of jail, the two returned to St. Louis together. During their return trip, Anthony Francis discussed the possibility of using alternative routes to avoid police detection in the future.

ii. Timothy Doyle

Timothy Doyle testified that he flew from California to the Midwest and back several times at Robert Francis's request, beginning in 1998. On these trips, Doyle transported a suitcase the Francis brothers gave him. When Doyle arrived at his destination city, he delivered the suitcase to one of the Francis brothers. A few days later, one of the brothers returned the suitcase to Doyle, who then flew back to California. The Francis brothers reclaimed the suitcase from Doyle in California.

---

[3] Law enforcement monitored this trip through a global positioning device installed on the Cadillac pursuant to a court order.

Doyle made twenty to thirty of these trips, and the Francis brothers paid him $500 to $1000 for each.  Doyle stopped working for the Francis brothers in October 1999.

### iii.  Timothy Hargrove

Timothy Hargrove testified that he flew with alleged coconspirator Harold Watkins to Los Angeles three times on behalf of the Francis organization.  On the first trip in 1998, the green Cadillac loaded with cocaine was ready for them upon their arrival.  On the other trips, Watkins telephoned Muhammad, met with him, and then drove a car loaded with cocaine back to St. Louis.  Watkins and Hargrove were arrested in January 2000 on the return leg of their third trip.  During the consensual search of Hargrove's vehicle, an officer discovered 11.47 kilograms of cocaine in the electronically-controlled secret compartment behind the rear seat.

## F.  November 2000 Drug Activity

At trial the government introduced wiretap evidence of a telephone conversation between Robert Francis and Muhammad, in which they coordinated a trip to transport cocaine from Los Angeles to St. Louis in November 2000. Muhammad told Robert Francis that he had loaded one vehicle with cocaine and was ready to deliver it.  He also indicated that he planned to use a man nicknamed "Crow-Bar" as the courier for this trip.

On November 26, 2000, an officer with the Arizona Department of Public Safety observed Robert Francis, Muhammad, and Tommy Macon, another courier, driving in tandem on the interstate.  Robert Francis was driving a Dodge Intrepid, Muhammad a green Cadillac, and Tommy Macon a Mercury Grand Marquis.  As the officer began to pass Robert Francis's vehicle, Francis nearly crashed into the officer. Believing that Francis was trying to distract him, the officer concentrated on the lead car driven by Tommy Macon.  The officer stopped Tommy Macon for speeding,

searched the vehicle, and arrested him after discovering approximately nine kilograms of cocaine.

On November 28, 2000, investigators initiated surveillance on Muhammad's property and observed the green Cadillac parked in Muhammad's garage. Later in the evening, someone covered the garage windows with brown paper. At that point, Inspector Dennis Simpson prepared affidavits for search warrants on numerous locations pertinent to the investigation.

Those warrants were executed on December 11, 2000. The search of Muhammad's house resulted in the seizure of $40,000 in cash and the green Cadillac. The search of the Francis brothers' homes were also fruitful. Thirty thousand dollars in cash, false identification, and paperwork connecting Anthony Francis to other members of the conspiracy were seized from Anthony Francis's residence. Officers found and seized several firearms at Robert Francis's residence. During the search of Davis's apartment, officers discovered more than two kilograms of cocaine above the tiles in the bathroom ceiling, a nine millimeter pistol in the bedroom, nine millimeter ammunition on a living room table, scales, baking soda, and numerous cellular telephones.[4]

Many of the conspirators were arrested in December 2000, but Robert Francis was not apprehended until March 2001. After his arrest, Robert Francis consented to the search of his vehicle. Officers found a .45 caliber handgun and $24,500 in cash in an electronically controlled secret compartment.

---

[4] Davis challenges the search of his apartment. The facts surrounding that search are included in Part III.F. of this opinion.

## G. Attorney Disqualification

Defendants were charged with conspiracy to distribute and possession with the intent to distribute over five kilograms of cocaine. Approximately one week before the scheduled trial date, the government filed a motion for an inquiry into a conflict of interest concerning Robert Francis's attorney, David Dudley. A hearing was held on February 11, 2002 concerning David Dudley's personal contact with one of the government's witnesses, Malarie Macon.[5]

Malarie Macon testified that she met David Dudley in 1995 at a hotel in St. Louis, Missouri, where she had sex with him in exchange for money. In the three years that followed, Macon had sex with Dudley six more times in exchange for money. For the next few years, Macon did not see Dudley. Then, in January of 2002, Dudley again paid Macon for sex. Macon testified that during three of her eight encounters with Dudley, including the January 2002 encounter, Dudley used cocaine.

At the hearing, Dudley acknowledged that he had consensual sex with Malarie Macon on several occasions, including once in January 2002. However, Dudley denied that the sexual encounters were in exchange for money and that he ever used illegal drugs in Malarie Macon's presence. He also testified that he did not realize Malarie Macon had any connection to the case.

The district court credited Malarie Macon's testimony that Dudley paid for sex with her and used cocaine. Consequently, it found that Dudley had an actual conflict of interest in representing Robert Francis and instructed Robert Francis to seek new counsel. Robert Francis obtained a new attorney, and the case proceeded to trial on May 1, 2002.

---

[5] Malarie Macon was charged by way of information and was not named in the indictment.

H. Jury Verdicts, Jury Misconduct, and Prosecutorial Misconduct

The trial below commenced on May 1, 2002 with seven defendants. On May 24, 2002, the jury returned a partial verdict finding Willie Ellis, Tommy Macon, and Jimmy Francis not guilty, and Robert Francis and Muhammad guilty. The jury was then released with instructions to report back to the court on May 28, 2002 for continued deliberation on the charges against the remaining defendants, Anthony Francis and Davis.

When the parties left the courthouse on May 24, 2002, Drug Enforcement Agent Ken Williams observed Juror #2 and alternate Juror #4 speaking with the acquitted defendants and Muhammad's attorney outside the courthouse. One of the acquitted defendants hugged Juror #2. After the group disbanded, Agent Williams saw Juror #2 and alternate Juror #4 walking together from the courthouse with Jimmy Francis, the brother of Anthony and Robert Francis, to a parking garage a block away.

Agent Williams reported what he saw to one of the government's attorneys, who in turn shared the information with the district court. On May 28, 2002, the district court also received a note from the foreperson of the jury indicating that the foreperson and alternate Juror #5 had seen Juror #2 and alternate Juror #4 talking and laughing with a group of people, including Robert Francis's attorney. The district court held a hearing on the matter. Agent Williams testified to the conversation he observed on May 24th and admitted that he did not hear the conversation. A court security officer also testified that he observed Juror #2 and alternate Juror #4 talking after court recessed on May 24th. Juror #2, unsworn, denied saying anything to any members of the defense. Alternate Juror #4 refused to answer any questions about the matter.

After the hearing, the court dismissed Juror #2. It found that her ability to serve fairly had been compromised, as she failed to follow the judge's instructions not

to have contact with the parties in the case. The court overruled defendants' motion for a mistrial and then allowed the remaining eleven jurors to deliberate. The jury rendered a guilty verdict against Davis but was deadlocked as to Anthony Francis.

Several weeks after the verdict, Robert Francis submitted to the court an affidavit from his brother, Jimmy Francis. According to Jimmy Francis, Juror #2 told him that the other jurors intimidated and taunted her and that this pressure made her change her vote in deliberations from not guilty to guilty. She also stated that the African-American jurors were under duress from the white jurors to vote guilty. Based on these allegations, Robert Francis petitioned the court to disclose the identity of Juror #2 and allow an interview of Juror #2. The district court denied Robert Francis's motion without holding a hearing on the issue.

After Robert Francis filed his petition for disclosure, his attorney notified the court that Juror #2 had telephoned him and identified herself. In that conversation, Juror #2 expressed concerns that one of the other jurors may have been in contact with U.S. Attorney John Ware. Defendants concede that Juror #2's concern was based on speculation.

## II.    APPLICABLE LAW AND DISCUSSION

### A.  Sufficiency of the Evidence

Davis and Anthony Francis argue that the evidence presented at trial was insufficient to support their convictions. We must reject this challenge if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In making this determination, we examine the evidence in the light most favorable to the verdict, giving it the benefit of all reasonable inferences. United States v. Cruz, 285 F.3d 692, 697 (8th Cir. 2002).

To convict a defendant of a conspiracy charge, the government must show: "(1) a conspiracy existed; (2) [the defendant] knew of the conspiracy; and (3) he knowingly became a part of the conspiracy. To establish the existence of a conspiracy the government needed to prove that there was an agreement among individuals to achieve an illegal purpose." United States v. Crossland, 301 F.3d 907, 913 (8th Cir. 2002) (internal citation omitted). "[T]he government may prove the agreement wholly by circumstantial evidence or by inference from the actions of the parties." United States v. Shoffner, 71 F.3d 1429, 1433 (8th Cir. 1995) (internal quotation omitted). "The agreement need not be express or formal," and "[t]he government must show no more than a tacit understanding among the participants." United States v. Quintanilla, 25 F.3d 694, 699 (8th Cir. 1994).

i. Anthony Francis

Evidence introduced at trial established that Anthony Francis was active in his brother's large-scale drug conspiracy. Cooperating coconspirators testified that Anthony Francis accompanied Robert Francis on numerous drug-related trips, made several by himself, and had direct contact with the organization's source of supply. He also recruited and paid couriers, organized their trips, and supervised them by following them in a trail car. When one courier, Johnny Macon, was arrested, Anthony bailed him out of jail and discussed with him how to avoid detection in the future. This evidence was more than enough to support Anthony Francis's conviction. See United States v. Garrison, 168 F.3d 1089, 1095 (8th Cir. 1999) (affirming conviction under 21 U.S.C. § 846 where the defendant and another coconspirator met with a courier, defendant paid the courier, and defendant took possession of cocaine from the courier on two occasions).

Anthony Francis attacks the credibility of the cooperating coconspirators who testified against him, claiming that their testimony was unreliable and uncorroborated. Francis's challenge is unavailing. We have consistently held that

-15-

issues of witness credibility are for a jury to decide, see United States v. Santos-Garcia, 313 F.3d 1073, 1081 (8th Cir. 2002); United States v. Aguayo-Delgado, 220 F.3d 926, 935 (8th Cir. 2000); United States v. McFarland, 116 F.3d 316, 317 (8th Cir. 1997), and the case at bar does not merit deviation from this precedent. The cooperating coconspirators were thoroughly cross-examined as to their plea agreements and involvement in the offense. They did not make any significant inconsistent statements, and their testimony was corroborated by wiretap evidence.

ii. Germaine Davis

We also find that the government presented sufficient evidence to support the conviction of Davis. Harris testified that he purchased five kilograms of cocaine from Davis, and Anderson testified that he saw Davis deliver one kilogram of cocaine to Parker. Wiretap evidence introduced also indicated that Davis packaged and stored cocaine for Parker. All of this evidence was corroborated by the seizure of 2.5 kilograms of cocaine and other drug paraphernalia from Davis's apartment. It was not unreasonable for the jury to find Davis guilty of the crime charged. See United States v. Nicholson, 231 F.3d 445, 451 (8th Cir. 2000) (testimony of cocaine purchases along with wire-intercepted conversations discussing drug transactions sufficient for conspiracy conviction).

B. Whether the Indictment and Jury Verdicts were Deficient

Robert Francis and Muhammad contend that their sentences violated Apprendi v. New Jersey, 530 U.S. 466 (2000), and United States v. Cotton, 535 U.S. 625 (2002). Because defendants did not raise these arguments with the trial court, we review for plain error. United States v. Yellow Hawk, 276 F.3d 953, 955 (8th Cir. 2002).

The indictment alleged that defendants' offenses involved in excess of five kilograms of cocaine and were punishable under 21 U.S.C. § 841(b)(1)(A)(ii)(II). This section provides that where the offense involves five kilograms or more of cocaine, the defendant shall be sentenced to a term of imprisonment not less than ten years and not more than life. Because Robert Francis's life sentence and Muhammad's sentence of 360 months were both within the statutory range, the indictment was adequate under Cotton.

At sentencing, the district court set Robert Francis's offense level at 38 under U.S.S.G. § 2D1.1(a)(3), the base level for an offense involving over 150 kilograms of cocaine. Robert Francis contends that his sentence violated Apprendi, because the indictment did not allege, and the jury was not instructed that it must find, that the offense involved in excess of 150 kilograms of cocaine. This Court has specifically rejected the assertion that the jury must make a guideline quantity finding, holding that:

> Apprendi applies only if the defendant is sentenced above the statutory maximum. It is for the district court to determine the type and amount of drugs involved when determining the applicable sentencing range under the guidelines, so long as the sentence imposed does not exceed that applicable to the offense found by the jury[.]

United States v. Miller, 295 F.3d 824, 827 (8th Cir. 2002) (internal citations omitted).

At the conclusion of the trial, the district court instructed the jury that in order to find defendants guilty, it must find that their offenses involved more than five kilograms of cocaine. Defendants' sentences were within the statutory maximum for the offense alleged in the indictment and found by the jury. Therefore, we find that defendants' Apprendi challenge is without merit.

-17-

C. Quantity Assessment

We next consider whether the district court erred in assessing the quantity of drugs attributable to each defendant. In jointly-undertaken criminal activity, a defendant is accountable for his own conduct as well as conduct taken by others that was in furtherance of the activity and reasonably foreseeable. U.S.S.G. § 1B1.3(a)(1)(B). This applies to drug quantities implicated in a conspiracy. United States v. Frazier, 280 F.3d 835, 852 (8th Cir. 2002). In determining drug quantity accountability, a district court may rely solely on the testimony of cooperating witnesses. United States v. Sarabia-Martinez, 276 F.3d 447, 450 (8th Cir. 2002). Drug quantity must be established by a preponderance of the evidence, and we will reverse only if the district court clearly erred. United States v. Jimenez-Villasenor, 270 F.3d 554, 561 (8th Cir. 2001).

i. Robert Francis

Robert Francis challenges his drug quantity assessment of more than 150 kilograms. Postal Inspector Dennis Simpson testified that 240 packages were mailed from St. Louis, Missouri to California in 1999. Approximately twenty of those packages were opened pursuant to search warrants and over $100,000 documented. The government presented evidence of fingerprint analysis, physical surveillance, and camera surveillance linking Robert Francis to these packages. Using an average of $6,000 per package, the government extrapolated that Robert Francis mailed approximately $1,428,000 in narcotics proceeds to California in 1999. Based on the wiretap evidence and the testimony of Detective Rick Koenemann and Agent Kenneth Williams, it was estimated that Francis was purchasing a kilogram of cocaine for approximately $15,000. Thus, by extrapolation, the government projected that Robert Francis was responsible for ninety-five kilograms in 1999.

The coconspirators' testimony supported the government's position that the conspiracy averaged two drug trips per month[6] at eight kilograms per load.[7] However, even assuming the organization averaged only one trip per month from January 2000 through September 2000, it is accountable for more than 70 kilograms in the year 2000. Coupling this estimate with the ninety-five kilograms attributable to the year 1999, the conspiracy involved more than 150 kilograms.

The district court considered the evidence mentioned above and made detailed findings with respect to the drug quantities for which it held Robert Francis responsible. We cannot say that the district court clearly erred in reaching its calculation.[8]

ii. Anthony Francis

Anthony Francis objects to the district court's assessment that he was responsible for more than fifty kilograms of cocaine. The evidence introduced at trial

---

[6] Tiffany Barry testified that she made five trips to California late in 1998 and eighteen trips in 1999. Malarie Macon testified that she made five trips in 1999. Doyle's testimony indicated that the conspiracy maintained an average of at least two trips per month until October 2000.

[7] The government seized 11.5 kilograms from Timothy Hargrove, 7.8 kilograms from Tiffany Barry, and 8.9 kilograms from Johnny and Tommy Macon. Thus, the actual average of the seized loads was 9.4 kilograms.

[8] Robert Francis also attacks his sentence by claiming that the drug quantities assessed to him were not part of one conspiracy, but were rather part of multiple conspiracies. The issue of whether the evidence presented at trial proves single or multiple conspiracies is a question for the jury. United States v. Adipietro, 983 F.2d 1468, 1475 (8th Cir. 1993). The jury was instructed on single versus multiple conspiracies and found Robert Francis involved in the single conspiracy charged. We find that the jury's finding is supported by the record.

showed that Anthony Francis was involved in at least eighteen narcotics loads from California to St. Louis.[9] At an estimate of eight kilograms per load, Anthony Francis was responsible for approximately 150 kilograms of cocaine. The district court's assessment of over fifty kilograms was not clearly erroneous.

Anthony Francis also contends that the district court failed to make appropriate findings of fact and credibility of witness determinations with regard to his drug quantity. We disagree. At sentencing, the district court twice made reference to reliance on the trial testimony to establish drug quantity. The district court also made reference to the government's sentencing brief, which contained the actual mathematical figures used to calculate Anthony Francis's drug quantity assessment. This was sufficient to permit meaningful appellate review. See United States v. Atkins, 250 F.3d 1203, 1211 (8th Cir. 2001) ("[T]he district court is required to make findings of fact and rule on unresolved objections to the PSR[.]").

   iii.  Germaine Davis

The district court found that Davis was responsible for between fifteen and fifty kilograms of cocaine. This calculation was based in part on the testimony of Harris, who stated he purchased cocaine from Parker at Davis's apartment on several occasions. Harris obtained five kilograms of cocaine from Parker in Davis's presence and purchased an additional five kilograms of cocaine directly from Davis. The 2.69 kilograms of cocaine involved in the August 2, 2000 transaction were also properly attributed to Davis, as the transaction took place at his apartment and was reasonably foreseeable to him. See U.S.S.G. § 1B1.3(a)(1)(B); Frazier, 280 F.3d at 852 (noting that in calculating drug quantities implicated in a conspiracy, defendant is

_____

[9] Anthony Francis arranged five trips with Tiffany Barry in the fall of 1998, five trips in early 1999, five more trips beginning in May 1999, and two trips in the summer of 1999. He also arranged one trip with Malarie Macon in 1999.

accountable for conduct taken by others that was in furtherance of the activity and reasonably foreseeable).

During the search of Davis's apartment, officers seized 2.5 kilograms of cocaine. Wiretap evidence presented at trial indicated that Davis stored an additional ten kilograms of cocaine for Parker.[10] Adding this to the 12.69 kilograms described above, more than fifteen kilograms of cocaine were linked to Davis.

Davis's contention that the testimony of coconspirators Harris and Anderson was uncorroborated, and was therefore unreliable, carries little weight. The district court has wide latitude in assessing witness credibility. United States v. Candie, 974 F.2d 61, 64 (8th Cir. 1992). ("[W]itness credibility is an issue for the sentencing judge that is virtually unreviewable on appeal."). Furthermore, we believe that the wiretap evidence and the physical items seized from Davis's apartment do corroborate the coconspirators' testimony. The district court did not err in assessing the quantity of drugs attributable to Davis.

### iv. Leo Muhammad

The district court found that Muhammad was responsible for between 50 and 150 kilograms of cocaine. The evidence introduced at trial supports this finding. Malarie Macon testified that Muhammad was directly involved in five of the trips she made to California. Malarie hauled an estimated eight kilograms per trip, so forty kilograms were attributed to Muhammad for this activity. The district court attributed two kilograms of cocaine to Muhammad for the $40,000 in cash that was seized in

---

[10] Drug Enforcement Agent James Catalano testified that the speakers in the wiretapped conversations used drug code in an attempt to conceal the meaning of their communications. Catalano was qualified to opine on the true nature of the wiretapped conversations, as he had five years of experience as a Special Agent with the Drug Enforcement Administration.

the green Cadillac at his home.[11] Muhammad was also responsible for the 8.9 kilograms of cocaine seized from Tommy Macon on November 26, 2000, as he was directly involved in the transportation of those drugs. This brings Muhammad's total to 50.9 kilograms.

In addition, Hargrove testified that he and Harold Watkins made three trips to California. On the first trip, the green Cadillac, which investigators later saw in Muhammad's garage, was loaded with cocaine and ready for Hargrove and Watkins upon their arrival. On the second and third trips, Hargrove and Watkins had direct contact with Muhammad. The district court reasonably attributed the estimated twenty-seven kilograms of cocaine involved in these trips to Muhammad. When combined with the amounts described above, Muhammad's total drug quantity is well over fifty kilograms.

D. Role in the Offense Enhancements

The district court imposed increases in the offense levels of Robert Francis, Anthony Francis and Muhammad based on their roles in the drug conspiracy. The court found that the Francis brothers were both "leaders/organizers" under U.S.S.G. § 3B1.1(a), and that Muhammad was a "manager/supervisor" under U.S.S.G. § 3B1.1(b). We review the district court's determination of defendants' roles in the offense for clear error. United States v. Gelinas, 299 F.3d 978, 979 (8th Cir. 2002).

---

[11] Detective Rick Koenemann testified that Robert Francis was purchasing a kilogram of cocaine for approximately $15,000. Thus, the proceeds found in the Cadillac were equivalent to more than two kilograms of cocaine.

i. Leaders/Organizers

Section 3B1.1 of the U.S.S.G. provides for a four-level increase in a defendant's offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a). "The determination of a defendant's role in the offense is to be made on the basis of all relevant conduct." United States v. Flores, 959 F.2d 83, 86 (8th Cir. 1992) (internal quotations omitted).

Initially, we note that the conspiracy in this case meets the second condition of U.S.S.G. § 3B1.1(a). The indictment charged thirteen defendants, and the activity was "otherwise extensive," as it involved more than 150 kilograms of cocaine and occurred over at least a two-year period in eight states. The question is whether the Francis brothers were organizers or leaders of the conspiracy.

We have held that the terms "organizer" and "leader" are to be interpreted broadly. United States v. Thompson, 210 F.3d 855, 861 (8th Cir. 2000). More than one defendant may be classified as an organizer/leader, see United States v. Bahena, 223 F.3d 797, 804 (8th Cir. 2000), and "a defendant need not have organized or led all of the other participants in the activity" for the enhancement to apply. Id.

Generally, "[t]he adjustment for being an organizer or leader is intended to reflect relative responsibility compared to other participants in the crime." United States v. Rodriguez, 112 F.3d 374, 377 (8th Cir. 1997). In deciding whether to apply the enhancement, courts should consider the following factors:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope

of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n. 4.

The government introduced evidence showing that Robert Francis mailed approximately $1,428,000 in drug proceeds in 1999 alone. When Robert Francis decided to stop shipping his drug proceeds via post, he recruited, directed and paid several couriers, including Doyle, Barry, Malarie Macon and Johnny Macon, to drive the proceeds from various locations to St. Louis. Given the nature and scope of the conspiracy and the control Robert Francis had over his coconspirators, we find the district court properly applied the four-level increase in Robert Francis's offense level under § 3B1.1(a).

The government presented evidence that Anthony Francis played a major role in the drug conspiracy as well. He stored cocaine for Garret Parker; arranged and oversaw several drug trips; recruited, instructed and paid couriers; and bailed one courier out of jail. Anthony Francis contends that the district court's findings did not establish that he controlled five people in the conspiracy. No such finding was necessary. See Rodriguez, 112 F.3d at 377 ( "[T]he five-participant requirement does not necessarily mean five participants under [the defendant's] direction . . . but, instead, five persons . . . involved in the overall crime, only one of whom need have been under [the defendant's] direction."). Anthony Francis also argues that the leadership enhancement should not be applied, because the government referred to him as a middle manager in its closing argument. However, the district court must base its determination of a defendant's role in the offense on the evidence, not the government's characterization of the evidence in argument. United States v. Rodamaker, 56 F.3d 898, 903 (8th Cir. 1995). We cannot say that the district court clearly erred in applying a leadership enhancement to Anthony Francis.

-24-

## ii. Manager/Supervisor

The district court found that Muhammad acted as a manager/supervisor in the conspiracy and applied a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b). We have held that "[a] manger or supervisor need only have managed or supervised one other participant in the criminal conspiracy" for the enhancement to apply. United States v. Zimmer, 299 F.3d 710, 724 (8th Cir. 2002). "'In addition, the enhancement may apply even if the management activity was limited to a single transaction.'" Id. (quoting United States v. Garrison, 168 F.3d 1089, 1096 (8th Cir. 1999)).

Evidence introduced at trial suggested that Muhammad played a managerial role in recruiting and organizing couriers for the drug organization. Malarie Macon testified that Muhammad introduced her to the Francis brothers, and wiretap evidence suggested that Muhammad selected the courier for the November 2000 drug trip. The wiretap evidence further showed that Muhammad assumed the role of Robert Francis's advisor, telling him how many conspirators were needed for a certain drug transaction. Muhammad also prepared a vehicle for couriers to drive on at least one occasion. Combined, this evidence is sufficient to support the application of a manager/supervisor enhancement under U.S.S.G. § 3B1.1(b). See United States v. Ortiz-Martinez, 1 F.3d 662, 677 (8th Cir. 1993) (holding that courts should consider factors such as "the nature of [the] defendant's role in the offense, the recruitment of accomplices, and the degree of participation in planning or organizing the offense" in determining whether the enhancement should be applied).

### E. Firearm Enhancements

The district court increased the offense levels of Davis and the Francis brothers by two points pursuant to U.S.S.G. § 2D1.1(b)(1) for possessing firearms during the

commission of their offenses.   We will not disturb this finding absent clear error. United States v. Williams, 10 F.3d 590, 595 (8th Cir. 1993).

i.   Davis

Upon searching 7228 Burrwood, Apartment E, officers discovered an unloaded nine millimeter Ruger in the front bedroom and nine millimeter ammunition in a bag on the living room table.  Davis contends that the pistol was not "possessed" within the meaning implied by the U.S.S.G. § 2D1.1(b)(1) nor "connected with the offense" in the sense intended by the commentary to that section.[12]  We disagree.

"To receive an enhanced sentence, the defendant need not actually have the weapon in hand; constructive possession is sufficient." United States v. Haren, 952 F.2d 190, 198 (8th Cir. 1991).  Constructive possession can be proven by showing that the defendant had "ownership, dominion, or control over the item itself, or dominion over the premises" in which the item was found.  Id. (internal quotation omitted).   The evidence at trial established that Davis lived at the Burrwood residence.  He signed the lease to the apartment, told the police that he lived there, and received mail there.  Davis suggests that Parker also may have lived in the apartment.  However, the fact that someone else may have lived with Davis does not refute the inference that he had dominion or control over his home and the weapon

---

[12] Application note 3 of the Commentary to § 2D1.1 provides in part:

The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons.  The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.  For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

U.S.S.G. § 2.D1.1 cmt. n.3.

found therein.  See id., 952 F.2d at 198 ("Because [the defendant] did exercise dominion, along with her husband, over the mobile home where the guns were found, we cannot say the district court was clearly erroneous in finding that [she] possessed the firearms.").

We also believe that the evidence was sufficient to support the district court's finding that the pistol was used in connection with Davis's drug activities.  Although the pistol was found unloaded in a closed case, the ammunition for it was found on the living room table.  This leads to a reasonable inference that the weapon was ready for immediate use.  As we have previously noted, "[P]eople who are dealing in drugs frequently use dangerous weapons, or have possession of dangerous weapons, for the purposes of protecting their bounty."  United States. v. Betz, 82 F.3d 205, 211 (8th Cir. 1996) (internal quotations omitted).  The record supports the district court's finding that Davis possessed the pistol for that very purpose.  More than two kilograms of cocaine were hidden in the apartment and a small scale was found in the same room as the pistol.  We cannot say the district court abused its discretion in applying the enhancement.

ii.  Anthony Francis

When Anthony Francis was arrested in October 1999, a police officer found a loaded .22 caliber pistol in his pocket.  In the same pocket, the officer discovered a business card for a St. Louis hotel with a room number written on the back.  This was later identified as the room of Doyle, a courier for the Francis's drug organization.  The government contended that around the time of his arrest Anthony Francis was scheduled to pick up Doyle from the St. Louis hotel and take him to the airport.  The record supports the government's argument. Coconspirator testimony revealed that the Francis brothers drove Doyle and the other couriers from their hotels to airports, and that the conspiracy was involved in heavy drug trafficking in the fall of 1999.

Under these circumstances, we cannot say the district court abused its discretion in applying the § 2D1.1(b)(1) enhancement to Anthony Francis.

### iii. Robert Francis

The day after he was arrested in March 2000, Robert Francis gave police officers consent to search his vehicle. A .45 caliber semi-automatic pistol was found in the secret compartment of the vehicle. Robert Francis argues that the firearm was not sufficiently connected to the conspiracy, because many of the members of the conspiracy had been arrested a few months before his arrest. We disagree. Although many coconspirators had been arrested by the time the authorities found Robert Francis, the source of the conspiracy's cocaine, Freddy Burgueno, was still at large. The district court's application of an enhancement under § 2D1.1(b)(1) of the Guidelines was not an abuse of discretion.

### F. Search of 7228 Burrwood, Apartment E

On December 8, 2000, James Catalano, a Special Agent of the Federal Drug Enforcement Administration, applied for a warrant to search a number of locations in the St. Louis area, including 7228 Burrwood, Apartment E. Catalano's sixty-one-page supporting affidavit provided an overview of the large-scale drug investigation. Catalano stated that agents had intercepted several telephone calls from a cellular telephone billed to Gary Henderson, Davis's alias, at 7228 Burrwood, Apartment E, St. Louis. During these intercepted calls, Davis and Parker engaged in veiled conversations about cocaine. Catalano also stated that officers had intercepted telephone calls between Harris and Parker, in which Harris made arrangements to travel from Springfield, Illinois to St. Louis to obtain cocaine from Parker. After receiving these interceptions, surveillance was established on Harris, and officers observed him drive from Springfield to St. Louis. In his affidavit, Catalano further stated:

Harris drove to 7228 Burrwood Court, Apt. E, where he entered, carrying a white plastic bag. After an approximate 10-minute stay, Harris exited the apartment with the plastic bag visibly larger than when he entered. Harris then proceeded to drive out of St. Louis toward Springfield, Illinois.

By prior arrangement, a marked Illinois State Police squad car (with its lights flashing) pulled out behind, and then passed, Harris as he drove on the highway. When the police car was out of sight, Harris pulled over to the right shoulder of the Interstate, Morgan exited the vehicle, and threw the white plastic bag into high weeds along the side of the road.

After Harris and Morgan left the area, the white plastic bag was recovered by surveilling officers, who discovered approximately 2.7 kilograms of cocaine inside the white bag.

At the suppression hearing, Catalano admitted that neither he nor the other officers actually saw Harris enter Apartment E. Instead, they only observed Harris enter the apartment building at 7228 Burrwood Court. Id. Davis challenges the district court's denial of his motion to suppress on this basis, claiming that the search warrant affidavit contained deliberate or reckless misrepresentations in violation of Franks v. Delaware, 438 U.S. 154 (1978).

"To prevail on a Franks claim the defendants must show: (1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining content is insufficient to establish probable cause." United States v. Reinholz, 245 F.3d 765, 774 (8th Cir. 2001). We find that Davis has failed to satisfy the second prong of the Franks test.

In his affidavit, Catalano reported that officers had intercepted telephone calls to and from Davis's cellular telephone in which Davis engaged in what Catalano believed were veiled conversations about cocaine distribution. As noted in the

affidavit, Catalano had eight years of experience investigating narcotics crimes. Thus, it was reasonable for the issuing magistrate judge to credit his opinion regarding the true nature of the intercepted conversations. See United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995) ("'[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed.'") (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Catalano also correctly stated that Davis resided at 7228 Burrwood Court, Apartment E, that Davis received mail at this address, and that Davis's cellular telephone number was registered to him at this address. Although Catalano misstated that officers saw Harris enter and exit Apartment E, when in fact, he only saw Harris enter the building located at 7228 Burrwood Court, we find that the other evidence in the search warrant affidavit sufficiently linked Davis to Apartment E and created a "fair probability that contraband or evidence of a crime" would be found therein. Gates, 462 U.S. at 238. See United States v. Richardson, 861 F.2d 291, 294 (D.C. Cir. 1988) ("It is not necessarily crucial to a finding of probable cause that a police officer observe an informant enter the specific apartment where a controlled buy is being conducted."). Because the search warrant application establishes probable cause when the misstatement is omitted, we find that the district court properly denied Davis's motion to suppress the evidence obtained during the search of his residence.

### G. Juror Misconduct

Defendants raise several issues with regard to jury misconduct. First, Davis argues that the district court erred by removing Juror #2. The decision to remove a juror is discretionary, and we will not reverse absent an abuse of discretion. Frazier, 280 F.3d at 851. If there is a legitimate basis for dismissing the juror, there is no abuse. United States v. McMasters, 90 F.3d 1394, 1402 (8th Cir. 1996).

The district court heard the sworn testimony of two law enforcement officers and reviewed the statements of two jurors, all of whom observed Juror #2 engage in

inappropriate contact with members of the defense. We find it insignificant that none of these observers overheard the details of Juror #2's conversation. Her contact with the parties involved in the case contravened the district court's directives and provided a sufficient ground for dismissal.

Robert Francis and Muhammad also argue that the district court erred by denying a hearing on the issue of whether Juror #2 was subjected to intimidation and taunting by her fellow jurors. They contend that if Juror #2's vote was influenced by such pressure, the jury's verdict is impeached and they are entitled to a new trial. We review the district court's denial of a hearing on this issue for an abuse of discretion. United States v. Caldwell, 83 F.3d 954, 955 (8th Cir. 1996)

To impeach a jury verdict, a defendant must produce evidence that is: (1) "'not barred by the rule of juror incompetency,'" and (2) "'sufficient to prove grounds recognized as adequate to overturn the verdict.'" United States v. Hall, 85 F.3d 367, 370 (8th Cir. 1996) (quoting United States v. Krall, 835 F.2d 711, 715 (8th Cir. 1987)). The rule of juror incompetency is set forth in Federal Rule of Evidence 606(b):

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

In <u>Tanner v. United States</u>, the Supreme Court explained the rationale behind this rule as follows:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. *Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.*

483 U.S. 107, 120-21 (1987) (internal citations omitted).

We do not believe the district court erred in refusing to hold a hearing or in refusing to disclose the name of Juror #2. Jimmy Francis's affidavit, which was submitted weeks after the conclusion of the trial, set forth generalized allegations that Juror #2 experienced feelings of intimidation, duress, and taunting from other jurors. As Jimmy Francis was a defendant in the trial and is the brother of two convicted coconspirators, the district court had ample reason to question his reliability. Moreover, even assuming his affidavit is to be believed, the district court had ample reason to doubt the reliability of Juror #2's hearsay statements contained therein. As previously discussed, Juror #2 was dismissed from the jury for failing to abide by the court's instructions not to speak with parties involved in the case. At the hearing on that issue, Juror #2 denied the allegations made against her and gave testimony that was directly at odds with the testimony of two court officers and the statements of two other jurors. The district court did not believe Juror #2. Based on Juror #2's record of disobedience and her lack of credibility, we do not believe the district court was required to give Jimmy Francis's affidavit more weight than it did.

-32-

Furthermore, "Federal Rule of Evidence 606(b) prohibits any inquiry into internal jury deliberations." United States v. Moses, 15 F.3d 774, 778 (8th Cir. 1994). Our jurisprudence in this area has consistently limited the type of evidence that is admissible to overturn a verdict on jury misconduct grounds. See e.g., id. (affirming a district court's denial of an evidentiary hearing after receiving a letter from a juror reporting "hostility during deliberations and [the juror's] post-verdict belief that [the defendant was] innocent"); United States v. Tallman, 952 F.2d 164, 166-67 (8th Cir. 1991) (holding that allegations of disagreement among the jurors during the deliberation process coupled with allegations that jurors insulted and harassed each other were not valid grounds to impeach jury's verdict). In the case at bar, the generalized nature of the allegations of pressure—made weeks after the trial had concluded by a juror who had been dismissed for engaging in misconduct—did not necessarily call for an evidentiary hearing. The district court did not abuse its discretion in denying Robert Francis's request for one.[13]

Next, Muhammad argues that the district court erred by not holding a hearing after being notified by Robert Francis's attorney that Juror #2 had "concerns" that another juror may have had inappropriate contacts with an Assistant United States Attorney. Muhammad concedes that Juror #2's "concerns" were based on mere speculation. Given Juror #2's lack of credibility, we cannot say the district court abused its discretion in denying a hearing on this issue. See Moses, 15 F.3d at 778 ("'weakly authenticated, vague, and speculative' showing of external influence does not warrant evidentiary hearing") (quoting King v. United States, 576 F.2d 432, 438 (2nd Cir. 1978)); United States v. Caldwell, 776 F.2d 989, 998 (11th Cir. 1985) ("The

---

[13] Robert Francis also argues that the district court should have held a hearing to determine whether Juror #2 was influenced by pressures beyond those alleged to have taken place in the jury room. Robert Francis did not present any evidence to the court below indicating that any sort of external pressure was placed upon Juror #2. Nothing in the record suggests that Juror #2 received any such pressure. We therefore find that Robert Francis's argument is without merit.

more speculative or unsubstantiated the allegation of [jury] misconduct, the less the burden to investigate.").

### H. Prosecutorial Misconduct

We next consider Muhammad's allegation that the government engaged in misconduct by contacting defense witness Abdul Wazier Muhammad before he testified at trial. As Muhammad did not raise this issue with the trial court, we review for plain error. United States v. Yellow Hawk, 276 F.3d 953, 955 (8th Cir. 2002).

The witness testified that Drug Enforcement Agent Ken Williams telephoned him a few days before he was scheduled to testify on Muhammad's behalf. The witness told Agent Williams that he did not want to speak with him without first getting permission from Muhammad's lawyer. On cross-examination, the witness admitted that once he indicated he did not wish to talk to Agent Williams, Agent Williams ended the call. Because Agent Williams's conduct was an attempt to interview a witness, devoid of any element of coercion or intimidation, we find that Muhammad's prosecutorial misconduct claim is wholly without merit. See United States v. Bittner, 728 F.2d 1038, 1041 (8th Cir. 1984) ("[T]he prosecution and the defense have an equal right to interview witnesses in a criminal proceeding . . . .").

### I. Severance

Muhammad alleges the trial court erred in denying his motion to sever his trial from that of the other defendants. We review the district court's refusal to sever for an abuse of discretion. United States v. Frazier, 280 F.3d at 844. "To succeed on appeal a defendant must show that he was clearly prejudiced by the joint trial." Id. (citing United States v. Patterson, 140 F.3d 767, 774 (8th Cir. 1998)). The federal system favors joint trials of defendants who are indicted together. Zafiro v. United States, 506 U.S. 534, 537 (1993); Frazier, 280 F.3d at 844 ("We have said many times

that it will be the rare case, if ever, where a district court should sever the trial of alleged coconspirators.").

Rule 8 of the Federal Rules of Criminal Procedure allows the joint indictment of "2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Where joinder is proper under Rule 8, a trial court has the discretion under Rule 14 to order severance for separate trials where the defendant would be prejudiced by joinder. As the Supreme Court has advised:

> when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

Zafiro, 506 U.S. at 539.

Muhammad argues that multiple conspiracies were improperly joined in a single conspiracy count in the indictment, and that this improper joinder permitted the jury to take into account the actions, criminal histories and hearsay statements of other persons who were in fact involved in separate and unrelated conspiracies. We disagree. The evidence introduced at trial sufficiently linked Muhammad to the conspiracy Robert Francis headed. Malarie Macon testified that Muhammad introduced her to the Francis brothers and assisted her with drug trips the Francis brothers coordinated. Wiretap evidence suggested that Muhammad helped Robert Francis coordinate the November 2000 drug trip. Muhammad's spill-over-effect argument is further weakened by the fact that the jury found three of his codefendants not guilty and were deadlocked as to another. This demonstrates that the jury was able to "sort[] out the evidence applicable to each defendant and render[] its verdict

accordingly." United States v. Elder, 90 F.3d 1110, 1120 (6th Cir. 1996). The district court did not abuse its discretion in denying Muhammad's motion to sever.

### J. Disqualification of Attorney David Dudley

Approximately one week before the scheduled trial date, the government filed a motion for an inquiry into a conflict of interest concerning David Dudley's personal contact with government witness and alleged coconspirator, Malarie Macon. At the February 11, 2002 hearing, Malarie Macon testified that Dudley had paid her for sex on several occasions and used illegal drugs in her presence. David Dudley admitted having a sexual relationship with Malarie Macon but denied paying for it and using illegal drugs. Over Robert Francis's waiver, the district court disqualified Dudley. The district court had broad discretion in making its disqualification determination. Wheat v. United States, 486 U.S. 153, 163-64 (1988).

"The [d]istrict [c]ourt must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." Id. at 164. Having found Malarie Macon's testimony credible, the district court concluded that Dudley's ability to represent his client was impaired by an actual conflict of interest. We agree. As the district court noted, Dudley's ability to thoroughly cross-examine Malarie Macon was compromised by their illicit sexual relationship and the fact that Malarie Macon was aware of Dudley's illegal drug use. Dudley's disqualification was not an abuse of discretion.[14]

---

[14] Robert Francis argues that the district court should have granted a continuance to allow Dudley time to submit scientific evidence to show a lack of drug usage. However, even if Dudley presented evidence showing that he had not recently used cocaine, ample grounds for disqualification remained. Under these circumstances, we cannot say the district court abused its discretion in denying Dudley's motion to continue.

## III. CONCLUSION

For the foregoing reasons, the convictions and sentences of the district court are affirmed.

_____